**WICHITA COCA-COLA BOTTLING COMPANY, Appellant,**

v.

**T. W. TYLER, Appellee.**

**No. 15698.**

Court of Civil Appeals of Texas.

Fort Worth.

March 16, 1956.

Rehearing Denied April 13, 1956.

904

Jones, Parish & Fillmore, and Elmer H. Parish, Wichita Falls, for appellant.

Allred & London, Renne Allred, Jr., Bowie, and Houston H. McMurry, Henrietta, for appellee.

MASSEY, Chief Justice.

This is a "mouse in the bottle" case. A primary question presented is whether plaintiff T. W. Tyler introduced evidence of sufficient probative force and value to sustain the jury's findings against the defendant Wichita Coca-Cola Bottling Company upon which judgment for damages was based.

We do not perceive from defendant's brief where there is actually a question of the sufficiency of proof related to the jury's findings that defendant did actually prepare and distribute to the retailer, an automobile service station operator, the bottle of coca-cola containing the deceased mouse. The same is true relative to the illness and disability to the plaintiff as the result of consuming the coca-cola therefrom. There is a true question presented upon the matter of whether proof was sufficient to establish the fact, and support the jury's finding, that the coca-cola was unfit for human consumption (because of the mouse) at the time it was delivered to the retailer.

We have examined the evidence and are of the opinion that there was sufficient evidence to support the verdict and judgment.

We elaborate upon the matter of sufficiency of the evidence to establish that the coca-cola was unfit for human consumption at the time it was delivered to the retailer (i. e., that it contained the mouse at such time). Defendant points out that it perhaps became unfit (through the insertion of the mouse) between the time of the delivery and of the plaintiff's consumption of it (and particles of mouse) a few days thereafter. Between the time coca-cola was delivered to the service station retailer and the time such retailer placed same in his beverage cooler box from which he dispensed the same at the time of sale, warm coca-cola in cases was kept in a storage room at the premises. The storage room was accessible to other persons, in particular to dealers in bottled soft drinks who were in competition with the defendant. Warm soda pop in cases,

delivered by defendant's competitors to the retailer, was stacked proximate to and right alongside the cases of coca-cola in said storage room. It is the contention of the defendant that one of its competitors could have furtively removed the cap from the subject bottle, inserted the mouse later discovered therein, and recapped the bottle in such a way as would defy detection other than by an expert. Defendant theorizes that just such an event could have been the circumstance in this case, and contends that since the evidence did not show that the retailer kept the bottle of coca-cola under lock and key, or otherwise protected against such tampering, between the time defendant delivered it to him and the time plaintiff received it,—but on the contrary proved the exact opposite,—there was either no evidence supporting the jury's finding as of the time defendant delivered the bottle or in the alternative there was insufficient evidence to support such finding.

■ We do not perceive where plaintiff should ordinarily have a greater burden of proof thrust upon him because of the fact that a manufacturer adopts a type of container susceptible to undetected tampering, or avails competitive wholesalers of an opportunity to sabotage one another's products, at least in the absence of some character of notice that the wholesalers were predisposed to such acts. We believe that we might take judicial notice that those in the soft drink business are not so disposed, as evidence the fact that for at least a generation they have continued the use of metal type "clamp-on" bottle caps which may be removed and replaced. We believe that this continued custom, instead of some character of cap with seal, which would be necessarily broken in order to tamper with the contents, speaks for itself. It seems to us that the same thing would apply to third persons other than the competitive wholesalers, particularly where there is no evidence that there had been any tampering.

■ And that is true in the instant case. There was evidence that the bottle was capped just like any other bottle of coca-cola, that there was nothing in connection with the removal of the cap that was other than ordinary to the removal of a bottle cap, and there was evidence that the bottle "spewed" just like any other ordinary bottle of freshly opened coca-cola. These events, coupled with those that followed, during which the plaintiff drank from the bottle, and coupled with the proof connecting the defendant up with the delivery of said bottle to the retailer, constituted a prima facie unbroken link from the defendant manufacturer to the plaintiff consumer. Lone Star Brewing Company v. Jones, Tex.Civ.App. San Antonio 1955, 278 S.W.2d 464; Amarillo Coca-Cola Bottling Co. v. Loudder, Tex.Civ.App. Amarillo 1947, 207 S.W.2d 632.

■ The amount of damages found by the jury in its verdict and entered in the judgment for the plaintiff was $3,500. The defendant contends that the amount so found was excessive. Plaintiff was a man fifty-nine years of age, a farmer, weighing 173 pounds on the date he drank from the bottle in question. He was thirsty when he drank from the bottle and took a sizeable swallow, then with the next mouthful he took he got hair in his mouth, realized that what he had already swallowed had a kind of a rotten taste to it, and then started vomiting immediately. He vomited outside the service station, and then went into the rest room and vomited. He was still vomiting when the doctor arrived and gave him some medicine. He went home but got sicker and vomited some more. He then went back to the doctor's office, and was sent to the hospital where he remained three days. He was fed intravenously, being unable to keep anything on his stomach. He continued to vomit occasionally for a month after the experience. He testified that he had a weak stomach at time of the trial, some fourteen months after drinking from the bottle. He testified that his weight, at its low point, was only 138 pounds, though it had risen to 161 pounds at time of the trial. In addition, there was medical testimony both pro and con upon the matter of whether plaintiff's trouble

was purely psychological. The jury found that plaintiff's injuries and damage were not caused solely by seeing the foreign substance in the bottle. We believe the question was for the jury and that its finding upon the matter of damages was not excessive.

■ During the course of plaintiff's argument to the jury, his counsel addressed the jury, and the following transpired:

"Mr. McMurry: * * * 'What amount of money, if any, if now paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate the plaintiff for the damages, if any, sustained as a direct result of having consumed a portion of the Coca-Cola in question, if you have found that he did consume a portion thereof.' Gentlemen, I don't know how you feel about it, but I wouldn't drink what is in that Coca-Cola bottle for $5,000 or any amount of money.

"Mr. Parish: We object to that, Your Honor.

"The Court: Sustain the objection.

"Mr. Parish: We ask the Court to instruct the jury not to consider it.

"The Court: You are so instructed, gentlemen.

"Mr. McMurry: All right, gentlemen, what amount of money will compensate him? How would you like to be in the position—

"Mr. Parish: Now, Your Honor, we object to that as being highly improper, and not the correct measures of damages.

"The Court: What is that?

"Mr. Parish: About how the jury themselves would feel about it if they were in that position.

"The Court: Sustain the objection.

"Mr. Parish: We ask for a mistrial at this time.

"The Court: Overruled.

"Mr. Parish: Note our exception.

"Mr. McMurry: Let's get down here, gentlemen, as to how to arrive at the damages if they object to the other angle of it.

"Mr. Parish: Your Honor, we have not only the right, but the duty to object to it when he says something improper.

"The Court: Sustain the objection.

"Mr. McMurry: * * *." (He continues with proper argument, reading what the court's charge recites as matter which can be taken into consideration in arriving at the amount of damages, and arguing thereon without further objection and without entering again upon matter complained of.)

The defendant contends that reversible error is apparent in that plaintiff's counsel asked the jury to place itself in the plaintiff's position in assessing the amount of damages.

Since we are of the opinion that the argument must be tested in light of the provisions of Texas Rules of Civil Procedure, rule 434, and since we are not aided by any evidence or inference that the jury was probably thereby persuaded to answer any issue contrary to that otherwise to be expected, we do not perceive the error to be such as would inhibit the verdict. See 3–B Tex.Jur., pp. 677–689, inclusive, secs. 1046–1047, and cases cited thereunder, particularly Aultman v. Dallas Railway & Terminal Co., 1953, 152 Tex. 509, 260 S.W.2d 596, and those following.

The judgment is affirmed.