John S. MARCHANT,
Plaintiff, Appellant,

v.

The DAYTON TIRE & RUBBER CO.,
Defendant, Appellee.

Nos. 87–1487, 87–1634.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1987.

Decided Jan. 6, 1988.

Joseph T. Papetti with whom Stephen M. Ouellette, Orlando & Associates, Glouces-

ter, Mass., and Peter A. Donovan, Boston, Mass., were on brief, for plaintiff, appellant.

Francis H. Fox with whom David A. Schecker and Bingham, Dana & Gould, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

COFFIN, Circuit Judge.

Plaintiff–Appellant, John Marchant, was injured when a tire manufactured by the defendant-appellee, Dayton Tire & Rubber, exploded while plaintiff was mounting it onto his truck. Following a jury trial at which defendant was found liable for damages for a breach of warranty on the tire, the trial judge entered a judgment for the defendant notwithstanding the verdict. Plaintiff appeals the judgment n.o.v.

## I.

On April 28, 1982, plaintiff was mounting a tire manufactured by defendant on a light truck wheel rim. Plaintiff had gotten the tire, which seemed to be in excellent condition, out of storage at his place of employment, J & P Trucking Co. He was mounting the second of two tires when the explosion occurred. Plaintiff had been mounting the actual rubber tire onto the wheel of the truck. He had learned to perform this procedure during previous employment in garages, and had performed this operation many times previously.

The trial judge described the operative facts as follows:

The process, oversimplifying, involves lubricating the deflated tire, prying it into position within the "well" of the wheel, and applying air pressure to force the wire "bead" of the tire outward, over an interior "hump," until it is seated firmly along the outer rim of the wheel. On this occasion plaintiff had just completed this process and was about to place the tire on his truck, when he discovered an air leak. He removed the tire, repaired the leak, and started again. He placed the tire on the floor, and while he was standing over it and reapplying air, the tire exploded. Subsequent examination of the tire showed that the bead had been broken, presumably during the second mounting, although it might have been damaged during the first. Defendant's witness testified that, if the bead gets "hung up" during the mounting process, too much air pressure may break it. It is industry-wide practice to advise against exceeding 40 lbs. per square inch (p.s.i.). Plaintiff estimated that he inflated the tire to no more than 55 p.s.i. on the first mounting of the tire, and to a lower pressure on the second.

Plaintiff claims that the accident resulted from improper design of the bead. The bead, embedded in the rubber, consists of a number of circles of several wires that ultimately overlap at their ends. Plaintiff's expert testified that there should have been no overlap. Defendant conceded that if excessive air pressure during mounting damaged the bead, it was most likely to break at an inside end of the overlap. However, its position was that the likelihood of beads being damaged was extremely remote, so remote that all domestic manufacturers, producing millions of tires a year, uniformly made their beads in this manner. Plaintiff's expert conceded that this was, and still is, the domestic practice, and stated he had criticized it "since the late '60's," and complained to the Department of Transportation in 1982. He pointed to a French manufacturer, Michelin, that uses many turns of a single wire, with the ends socket-welded to avoid the overlap. There was no evidence that even Michelin had adopted this procedure in 1973, the year of the present tire. At the same time, there would seem nothing so mechanically difficult about the process that it would not have been feasible earlier.

*Marchant v. Dayton Tire & Rubber Co.,* No. 85–1122–C–A, slip op. at 2–4 (D.Mass.

---

* Of the Fifth Circuit, sitting by designation.

May 6, 1987). There was further testimony that the plaintiff had never noticed any warning concerning the maximum air pressure for safe mounting of defendant's tire, but that he assumed from experience that no more than about 65 p.s.i. should be used.

The jury found for the plaintiff following a three-day trial, and awarded him $600,000 in damages. The district court granted the defendant's motion for judgment notwithstanding the verdict. It found that the plaintiff had failed to establish a breach of warranty[1] either on a theory of design deficiency or on the alternative theory of failure to warn. The district court also conditionally ordered a new trial, in the event that the j.n.o.v. was reversed on appeal. The court found that no reasonable jury, upon proper argument, would have rejected the affirmative defense that plaintiff's own unreasonable behavior was the proximate cause of his injury. The judge added that his decision to order a new trial was influenced by plaintiff's counsel's "improper closing" to the jury. Slip op. at 10–12. We address each of these issues in turn, beginning with the district court's judgment j.n.o.v. on the breach of warranty cause of action.

## II.

The Massachusetts Legislature has transformed warranty liability "into a remedy intended to be fully as comprehensive as the strict liability theory of recovery that has been adopted by a great many other jurisdictions." *Back v. Wickes*, 375 Mass. 633, 639, 378 N.E.2d 964 (1978). Massachusetts law of warranty is thus now "congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965)." *Id.* at 640, 378 N.E.2d 964.

This variant of "strict liability" offers two methods of establishing liability: proving a design defect, and demonstrating a failure to warn adequately of a dangerous condition.

### A.

A manufacturer has the duty to design products "so that they are reasonably fit for the purposes for which they are intended." *Smith v. Ariens Co.*, 375 Mass. 620, 624, 377 N.E.2d 954 (1978). A product is "reasonably fit" for its purposes if the design prevents the "reasonably forseeable risks attending the product's use in that setting." *Back v. Wickes*, 375 Mass. at 641, 378 N.E.2d 964. There is no real question in this case that plaintiff's use was forseeable.

This does not, however, end the inquiry. The "fitness" of the product "is a question of degree, depending largely, although not exclusively, on reasonable consumer expectations." *Id.* at 642, 378 N.E.2d 964. Even where the product design creates a risk of forseeable harm, "[t]he question is whether this risk was 'unreasonable.'" *Raney v. Honeywell, Inc.*, 540 F.2d 932, 935 (8th Cir.1976). The Supreme Judicial Court of Massachusetts has explained how this determination should be approached:

> In deciding this issue, the jury must weigh competing factors much as they would in determining the fault of the defendant in a negligence case. The inquiry focuses on product characteristics rather than on the defendant's conduct, but the nature of the decision is essentially the same. In evaluating the ade-

---

1. Plaintiff brought this action on alternative theories of negligence and breach of warranty. The judge's charge to the jury did not specify which causes of action the jury was being asked to rule on. According to the district court, plaintiff waived the negligence count. The defendant thought, on the other hand, that the negligence count was the *only* theory on which the jury had been charged. The plaintiff contends that it did not waive either count, and that the jury charge reflects both theories. All discussion of these matters seems to have taken place off the record.

We agree with the district court that the jury was charged on a warranty theory, even though "a small portion of the charge might be read as sounding in negligence." Slip op. at 1 n. 1. Because we conclude that the verdict should stand on the warranty cause of action, we need not reach the question of whether the jury verdict further supports a finding on negligence. The plaintiff's recovery would not be enhanced by the additional finding of negligence.

quacy of a product's design, the jury should consider, among other factors, "[1] the gravity of the danger posed by the challenged design, [2] the likelihood that such danger would occur, [3] the mechanical feasibility of a safer alternative design, [4] the financial cost of an improved design, and [5] the adverse consequences to the product and to the consumer that would result from an alternative design."

*Back v. Wickes*, 375 Mass. at 642, 378 N.E.2d 964 (quoting *Barker v. Lull Eng'r Co.*, 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)) (citations omitted). In balancing these "pertinent factors," the jury must make a judgment as to the "social acceptability of the design." *Back*, 375 Mass. at 642, 378 N.E.2d 964.

In the present case, plaintiff offered evidence to show the gravity and likelihood of danger posed by the design. Plaintiff also introduced the current Michelin tire in evidence, to show the "feasibility" of an alternative design at the time of manufacture. The district judge acknowledged that the Michelin design was not "so mechanically difficult ... that it would not have been feasible earlier." Slip op. at 4. The plaintiff's expert testified that the Michelin design was a safer alternative. Defendants concentrated on showing that the Michelin design would not have decreased the chances of explosion.

██ Neither party offered any evidence as to the costs and consequences of the alternative design, the "fourth" and "fifth" factors in the *Back v. Wickes* analysis. According to both the district court and the defendant, this omission of evidence as to the "trade-offs" is fatal to the plaintiff's case. The defendant introduced testimony that no domestic manufacturer was using the alternative design at the time the tire in question was built. The court reasoned

that the plaintiff then had the burden to offer evidence "of the cost of the Michelin structure, or how much stronger the Michelin design would be, or whether there were any other performance or safety characteristics that would favor or disfavor its use. One or more of these factors presumably was of moment, in light of the fact that no domestic manufacturer was using it." Slip op. at 4–5. Defendant's expert did concede that the vast majority of bead failures occurred at the overlap, and plaintiff's expert testified that he had never seen such a failure on a Michelin "non-overlapped" tire. The judge insisted that this alone did not establish a case for liability, without further evidence proving that the "trade-offs" made the alternative design more reasonable. In essence, the court insisted that the plaintiff prove to the jury the cost/benefit efficiency of the alternative design. Defendant also relied, both in its brief and at oral argument, on the proposition that the plaintiff has the burden of presenting to the jury the *Back v. Wickes* factors. *See, e.g.,* Appellee's Brief at 18.[2]

This is not, however, the holding of *Back v. Wickes*. The question which prompted the listing of relevant factors in that case was whether evidence *could* be introduced to show what the trade practices were at the time. The Supreme Judicial Court ruled that such evidence was relevant, because it was probative of the reasonableness of the challenged design. *Id.* 375 Mass. at 642–43, 378 N.E.2d 964. Even this evidence, however, is not dispositive, and "counsel may argue that industry standards can and should be more stringent." *Id.* at 643, 378 N.E.2d 964. Thus, plaintiff's case is not automatically defeated merely because the alternative design was not being used at the material time.

██ The trial judge properly instructed the jury here that the "competing

---

**2.** Appellee also contends that the Michelin tire was insufficient to establish an alternative design because there was no evidence that it was actually available at the time that the tire in question was manufactured. The alternative need not be in fact available, however. The *Back* test is one of feasibility. There is no dispute here that the Michelin design was feasi-

ble in 1973. All the jury must find is that a more reasonable design than the one in question *could* have been produced. As we explain below, though the absence of the alternative design in the industry might be probative of its unreasonableness, such an absence is not dispositive on the issue of feasibility.

factors" should be balanced when deciding reasonableness of design.[3] Such an instruction is all that *Back v. Wickes* requires. There is no authority for the proposition that these factors must be introduced by the plaintiff, nor that the plaintiff must prove that the alternative design was efficient on a cost/benefit basis. *But cf. Oberst v. Int'l Harvester Co., Inc.*, 640 F.2d 863, 865 (7th Cir.1980) (under Illinois law, plaintiffs must prove that alternative design was "feasible" "in terms of cost, practicality and technological possibility," where "feasibility" includes elements of economy, effectiveness and practicality); *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 744 (7th Cir.1974) (same).

Defendant's theory on the burden of proof is further belied by the Supreme Judicial Court's dispositions in *Smith v. Ariens Co.*, 375 Mass. 620, 377 N.E.2d 954 (1978), and *doCanto v. Ametek, Inc.*, 367 Mass. 776, 328 N.E.2d 873 (1975). In those cases, the SJC specifically held that in some circumstances, the plaintiff need not present any expert testimony at all in order to demonstrate unreasonable design. A jury might be able to find that the challenged design breaches the duty of reasonable care in design simply on the basis of its own lay knowledge. 375 Mass. at 625, 377 N.E.2d 954; 367 Mass. at 782–83, 328 N.E.2d 873. In *Smith*, decided the same day that the *Back v. Wickes* catalogue of factors was announced, the SJC upheld a verdict that a snowmobile was designed

such that an "unreasonable risk of harm" was created, where the only evidence relied upon by the jury was the snowmobile itself. *Id.* Not only did the plaintiff in *Smith* fail to address the costs and efficiencies of alternative designs, but no alternatives were even suggested. *See also Raney v. Honeywell, Inc.*, 540 F.2d 932, 935 (8th Cir.1976) (reiterating "relevant factors to be considered," but upholding jury verdict even without plaintiff evidence of alternatives' costs and benefits).

We conclude, then, that unless the Supreme Judicial Court was taking with one hand what it was providing with the other when it issued the *Back* and *Smith* opinions, plaintiff here has presented sufficient evidence for a finding of an unreasonable defect. If the defendant believed that a cost/benefit analysis of alternatives would demonstrate its design to be reasonable, then it was its responsibility to produce evidence in support of such a theory. It might, *e.g.*, have offered evidence to explain *why* no one in the industry was using the Michelin design in 1973. Its failure to do so should not redound to the detriment of the plaintiff.[4] On this record, the jury's verdict must be upheld on the plaintiff's theory of breach through defective and unreasonable design.

### B.

Plaintiff's alternative ground for liability also supports the verdict. A prod-

---

3. The court's charge was as follows:

Some precautions ... may not be practical, either because the expense would be so great that the article would be too expensive for purchasers or a precaution might spoil the utility. A child might put his hand in the toaster and burn it. This could be prevented by some kind of a guard perhaps, but who would buy such a toaster? There must be a reasonable limit.

....

[Y]ou may ask yourself did the defendant make the bead rings as safe as was reasonable? What were the alternatives? You may consider the likelihood of the danger and you may consider the extent, the seriousness, of the danger. In your weighing of what is a reasonable product you may properly look to the industry at large as a guide. It is not necessarily a guide. Did all of them go wrong?

4. We note in passing that it makes sense not to place upon the plaintiff the initial burden of showing the relative efficiency and cost of the alternative design. The defendant has the actual knowledge of why certain designs were chosen over others, and it cannot be presumed that this specialized knowledge could be readily discerned by the plaintiff. We do not mean to suggest, however, that the burden of proof is shifted to the defendant as soon as the plaintiff introduces evidence of a viable alternative. The jury is free to weigh all of the *Back* factors on the evidence before it. As the trial judge suggested in his jury charge in this case, the jury could simply decide that the proposed alternative design is self-evidently unreasonable, just as it could conclude that a challenged product is defective without any evidence of viable alternatives.

uct is "unreasonably dangerous and, therefore, ... not fit for the purposes for which such goods are used, if foreseeable users are not adequately warned of dangers associated with its use." *Hayes v. Ariens,* 391 Mass. 407, 413, 462 N.E.2d 273 (1984).

The defendant offered evidence that it had distributed to tire dealers a chart prepared by the Rubber Manufacturers Association that warned not to inflate tires above 40 p.s.i. when mounting. No warning was placed on the tire or distributed to every foreseeable mounter of the tire. The plaintiff, who was a foreseeable user, testified that he had never inflated a tire while mounting at more than about 65 p.s.i. The jury was within its rights to decide that the poster distributed to dealers was inadequate to warn foreseeable consumers, especially if the plaintiff had not noticed the warnings on the poster in all his years in the business. The district court acknowledged that questions regarding the adequacy of warnings are "are 'almost always an issue to be resolved by a jury.'" Slip op. at 7 (quoting *MacDonald v. Ortho Pharmaceutical Corp.,* 394 Mass. 131, 140, 475 N.E.2d 65 (1985)).

The court nevertheless found that the jury's verdict could not stand, again because the plaintiff had not introduced any evidence to rebut the industry-wide practice of not providing warnings. The plaintiff's alleged dereliction once more was to ignore the "trade-offs" which would have to be made if a more specific warning was provided, according to the trial judge. Slip op. at 7–8.

■ However, contrary to the court's assertions, we do not think that the process by which the industry makes decisions regarding proper warnings on its products is such a "specialized area" that "it would be beyond the province of a lay jury, unaided,

to make a substantive finding outweighing that of an entire industry." Slip op. at 8. The test is whether the warning is comprehensible to the average user and whether it conveys a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person. *MacDonald,* 394 Mass. at 140, 475 N.E.2d 65. "Few questions are 'more appropriately left to a common sense lay judgment than that of whether a written warning gets its message across to an average person.'" *Id.* (quoting *Ferebee v. Chevron Chem. Co.,* 552 F.Supp. 1293, 1304 (D.D.C.1982)). Just as in the area of defective design, the jury is perfectly capable of assessing whether the proposed warning would be unreasonable because of possible cost or confusion.

■ Defendant argues that the plaintiff had the burden of showing how a particular hypothesized alternative warning would have prevented the accident in this case. But if the jury may use its lay knowledge to decide that a particular design is defective, it can just as easily infer that a warning on the tire wall would have alerted plaintiff to the dangers of inflating over 40 p.s.i. *Cf. Hayes,* 391 Mass. at 409–10, 462 N.E.2d 273 (even without specific evidence of alternative warnings, jury could have found that reasonably prudent manufacturer of snowmobile would have affixed a different warning). This is particularly true where, as here, the user would have had numerous opportunities to notice such a warning, since he had had extensive exposure to the tires in the past.[5]

The jury's verdict was therefore supported by the evidence on the warning theory as well; defendant's failure to demonstrate why other warnings might have been inefficient or ineffective does not change the fact that plaintiff introduced

---

5. There is no suggestion in the record that an intermediary's failure to warn was a superseding cause of the injury. *See MacDonald,* 394 Mass. at 135–36, 475 N.E.2d 65. Plaintiff, whose job it was for many years to perform this precise operation, is exactly the sort of "consumer" whose use of the tire for mounting purposes is most foreseeable. Reliance on an intermediary to warn such a user would not be reasonable. If, however, the tire had been sold to a person untrained in mounting, there might be an argument that the manufacturer reasonably relied on the seller to provide the warning. In this case, however, there is no evidence that the defendant provided proper warning even to those persons who would most likely be mounting the tire on a wheel.

sufficient evidence from which the jury could infer inadequate warning in this case.

The trial court's judgment notwithstanding the verdict is vacated, and the district court is instructed to reinstate the verdict as to liability.

## III.

■ The district court also ordered, in the alternative, that a new trial be granted, on the ground that an affirmative defense was so clearly made out that no reasonable jury should have rejected it. In order to establish an affirmative defense in this context, the defendant must prove "that the plaintiff knew of the product's defect and its danger, that he proceeded voluntarily and unreasonably to use the product and that, as a result, he was injured." *Allen v. Chance Manufacturing Co.*, 398 Mass. 32, 34, 494 N.E.2d 1324 (1986).

The defendant in this case, however, could not possibly establish the affirmative defense to the claim of defective design, because there is no evidence that the plaintiff was even aware of the dangerousness of the bead design.

As to the claim of breach for failure to warn of a dangerous condition, the trial judge decided that the plaintiff had acted "unreasonably" under the *Allen* standard, in that he "knew that too much air could cause a tire to explode, that mounting a tire called for special knowledge, and ... that instructions were available, but stood over the tire administering a high amount of pressure without consulting them." Slip op. at 9–10.

The plaintiff testified that he had never before inflated a tire during mounting to more than about 65 p.s.i., because he estimated that a greater pressure would be unsafe. He also testified that he thought that the tire in question at no time had more than 55 p.s.i. while he was mounting it, and that the tire was at approximately 40 p.s.i. when it exploded. One of the defendant's experts contended that plaintiff might have inadvertently pumped in over 60 p.s.i. Plaintiff's expert testified that not only was plaintiff's mounting proper, but also that the bead would not burst

until the tire had reached pressures of approximately 320 p.s.i. One of the defendant's experts estimated the "bursting pressure" of the tire at 160 p.s.i. Another expert testified that the bead could not be broken at pressures lower than 60 p.s.i., presuming the tire had been properly mounted.

From all this testimony, the jury properly could have concluded that plaintiff reasonably thought that the tire could not explode at pressures below 65 p.s.i., and that his inflation of the tire that day was below this figure. They could have also found that plaintiff, who had performed this process at least 20 or 30 times previously, was not acting unreasonably in his mounting procedure, despite the fact that he did not stop to check instructions. In fact, such a precaution would be rarely taken by someone with plaintiff's experience. Moreover, because there was testimony that pressures far above the 55 p.s.i. plaintiff estimated he used would be necessary to cause the bead to explode, the jury could have decided that the air pressure alone was not the cause of the bead's failure. In that case plaintiff's behavior, whether or not it was reasonable, would not have been the proximate cause of the explosion and his injuries. *See Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 356, 446 N.E.2d 1033 (1983). The jury's verdict reflects an appropriate rejection of the defendant's affirmative defense.

We have accepted the truism that a trial judge is not a thirteenth juror who may set aside a verdict because he interpreted the evidence to reflect another result. *See, e.g., United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir.1986); *Payton v. Abbott Labs*, 780 F.2d 147, 153 (1st Cir.1985); *Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir.1978). Despite our general deference to the trial court, this circuit "puts definite limits upon a district court's right to upset a jury verdict," so as to "protect the fragile power given to the jury." *Rothrock*, 806 F.2d at 322.

We have thus developed the following standard of review:

Where an order for a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial, we will exercise a more stringent standard of review, *Payton*, 780 F.2d at 152, requiring the court to refrain from interfering " 'unless it is quite clear that the jury has reached a seriously erroneous result.' " *Borras*, 586 F.2d at 887, *quoting* 6A J. Moore, Moore's Federal Practice ¶ 59.–08[5], at 59–160 to 161. *Rothrock*, 806 F.2d at 322. In this case, we think that it was improper for the court to second-guess the jury's evaluation of the evidence on the affirmative defense, for reasons we have explained above. The jury's result was not "seriously erroneous."

### IV.

■ The district court's final (and perhaps pivotal) ground for a new trial is that plaintiff's counsel indulged in many errors during closing argument. Under the *Rothrock* standard quoted above, we do not exercise as strict a standard of review for an order of new trial when that order is predicated on concern about the effect of prejudicial acts that may have resulted in an unfair trial.

The misrepresentations of evidence alluded to by the judge, however, do not rise to the level necessary to erase the jury's otherwise reasonable verdict on liability.[6] Most of these alleged errors consisted of interpretations by counsel of the inferences suggested by the evidence. At two separate points in counsel's argument, the court specifically instructed the jury to ignore counsel's opinions as to the credibility or interpretation of evidence. Again in its jury charge, the court criticized counsel "both in general for stating his opinion, which is fundamentally off limits, and also

with respect to a particular instance when he spoke of the evidence which did not at all coincide with my memory." (A. 291.) We think that these admonitions were sufficient to offset any slight prejudice that may have been engendered by counsel's remarks.

We therefore set aside the order for a new trial.

### V.

■ The jury awarded plaintiff $600,-000 in damages, although his only substantial injury was a broken wrist. The trial judge generously characterized the jury's award as "very high." Slip op. at 12.

The plaintiff has undergone extensive physical therapy on his wrist, with prospects of further therapy in the future. Plaintiff was also required to undergo surgery where a cube of bone was transferred from his hip to his wrist, a procedure that might be repeated in the near future. He was confined to bed for four weeks following the first procedure, and had to go without work for approximately two years. He still must soak and heat the wrist on a daily basis. Plaintiff had, until the accident, been in the process of investing time, money and effort into learning the trade of carpentry. He had planned to start his own carpentry business, but is prevented by his injury from pursuing that career. While plaintiff thus has been denied the livelihood to which he had aspired, he evidently has not suffered significant financial losses on account thereof. His employment as an operator of heavy equipment has provided a higher salary than he would normally have realized as a carpenter. Plaintiff introduced evidence, however, that this alternative employment is possibly more provisional and uncertain than carpentry, because of the indeterminate future effects of the health of the industry, the weather, and plaintiff's continued abilities

---

**6.** It should also be noted that trial judge seemed to have considered this factor only insofar as it contributed to what he viewed as the jury's improper verdict on the affirmative defense. Slip op. at 10. He explicitly noted that he was not treating counsel's remarks as an independent ground for new trial, but only as a "make-

weight" within his analysis of the verdict on the affirmative defense. *Id.* at 10 n. 5. Because we have already found that verdict to be sound, we do not think it appropriate to presume that the district court would have granted a new trial solely on the basis of the closing argument.

to work with heavy equipment despite his injuries. Plaintiff also testified as to his pain and suffering as a result of the injury.

We think that, in light of this evidence, $600,000 in damages is so excessive as to warrant our intervention. The evidence of medical expenses and lost wages indicates special damages totaling at most $50,000. Even accounting for future damages, $550,000 for pain and suffering is not reasonable in these circumstances; it is "so grossly disproportionate to the injuries ... as to be unconscionable." *Laaperi v. Sears, Roebuck & Co., Inc.*, 787 F.2d 726, 735 (1st Cir.1986). The verdict is not "within the universe of possible awards which are supported by the evidence." *Clark v. Taylor*, 710 F.2d 4, 13 (1st Cir. 1983).

We conclude that a new trial on damages is appropriate here. However, we condition this holding on plaintiff's declining to remit half of the total amount awarded by the jury. We think that $300,000 represents the highest reasonable total of damages for which there is adequate evidentiary support in this case. *See Laaperi*, 787 F.2d at 734. Conditioning a new trial on such a remittitur comports with the "maximum recovery rule" adopted by this and other circuit courts. *See, e.g., Liberty Mutual Ins. Co. v. Continental Casualty Co.*, 771 F.2d 579, 588–89 (1st Cir.1985); *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1046–47 (5th Cir.1970).[7] Plaintiff has the privilege under the Seventh Amendment of choosing to take his chances on a new trial in the hope that a second jury might return a verdict for a higher amount. If, however, plaintiff opts to remit half of the general verdict, defendant would not in any way be prejudiced.

*Cf. Liberty Mutual*, 771 F.2d at 588. The remaining total is a reasonable one which cannot be challenged; the remittitur "has the effect of merely lopping off an excrescence." *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935).

*Accordingly, the district court shall reinstate the verdict of the jury on liability. The judgment notwithstanding the verdict is vacated. A new trial shall be ordered on damages only if plaintiff decides not to remit $300,000 (plus any interest accrued thereon) from the general verdict of $600,000.*

7. It might be argued that setting a maximum possible figure on remittitur is impossible in a case involving unliquidated damages such as pain and suffering. *See, e.g., Hulett v. Brinson*, 229 F.2d 22, 25 (2d Cir.1955). *Cf. Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir.1982) (where defects in award are "readily identified and measured," remittitur more appropriate, because "[a]djustment of the award is fairly mechanical and does not interfere with the jury's function"). But this assumption is probably merely a vestige of the obsolete belief that appellate review is always inappropriate as to

these types of damages. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2820, at 134–35 (1973). It is now not uncommon for appellate courts to prescribe remittitur in such a case. *See, e.g., Sam's Style Shop v. Cosmos Broadcasting Corp.*, 694 F.2d 998, 1008 (5th Cir. 1982); *Keyes v. Lauga*, 635 F.2d 330, 336 (5th Cir.1981). Of course, we cannot pretend to simple precision in establishing a maximum reasonable amount of pain and suffering damages. We believe, however, that $300,000 is a very generous estimate of the outer bounds of a reasonable award in this case.