UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2479
BEREND J.D. HAVINGA, ET AL.,

Plaintiffs, Appellees,

v.

CROWLEY TOWING AND TRANSPORTATION COMPANY,

Defendant, Appellant.

No. 93-1073
BEREND J.D. HAVINGA, ET AL.,

Plaintiffs, Appellants,

v.

CROWLEY TOWING AND TRANSPORTATION COMPANY,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen C. Cerezo, U.S. District Judge]

Torruella, Cyr and Boudin,

Circuit Judges.

J. Ramon Rivera-Morales, with whom Manolo T. Rodriguez-Bird

and Jimenez, Graffam & Lausell were on brief for defendant Crowley

Towing.
Eugene F. Hestres, with whom Bird, Bird & Hestres and Jose F.

Sarraga were on brief for plaintiffs Berend J.D. Havinga, et al.

June 2, 1994

CYR, Circuit Judge. This admiralty action stems from a
CYR, Circuit Judge.

nighttime collision approximately four miles off the island of

Culebra, Puerto Rico, between the 65-foot sailboat GLORIA and a

262-foot barge under tow by the tugboat BORINQUEN, owned by

defendant-appellant Crowley Towing and Transportation Co., Inc.

The five plaintiffs, the captain and crew of the GLORIA, were

forced to abandon her moments before the collision and were

rescued several hours later.

Following a ten-day trial in the United States District

Court for the District of Puerto Rico, a jury found Crowley's

negligence the sole cause of the collision, and awarded damages

totalling $1,661,700.1 Judgment entered on July 24, 1992. On

August 7, plaintiffs filed a motion to amend the judgment to

provide for attorney fees, prejudgment interest, and extraordi-

nary costs. As the Rule 59(e) motion was not served until

August 11, it was summarily denied. See Fed. R. Civ. P. 59(e).

Meanwhile, Crowley had renewed its motion for judgment as a

matter of law or for new trial, which the district court denied

on November 18. See Fed. R. Civ. P. 50(b). Crowley now appeals

both the final judgment and the order denying its Rule 50(b)

motion for new trial or for judgment as a matter of law. The

plaintiffs cross-appeal from the denial of their Rule 59(e)

motion to amend the judgment.

1At the end of plaintiffs' case and again at the close of
the evidence, Crowley unsuccessfully moved for judgment as a
matter of law, see Fed. R. Civ. P. 50(a), on the issue of compar-

ative fault.

2

I

DISCUSSION

A. THE CROWLEY APPEAL

1. Liability

On appeal, Crowley contends, inter alia, that the

special jury verdict on liability is contrary to the evidence on

comparative fault.

a. Standard of Review

Absent a controlling error of law, which we review de

novo, see Stauble v. Warrob, Inc., 977 F.2d 690, 693 (1st Cir.

1992), an order denying a new trial will be reversed only if the

verdict was against the clear weight of the evidence, viewed in

the light most favorable to the prevailing party, or would work a

clear miscarriage of justice, Phav v. Trueblood, 915 F.2d 764,

766 (1st Cir. 1990). As Crowley asserts no error of law, we

review only for abuse of discretion. Id.

A federal court may not set aside a jury verdict and

direct the entry of a contrary verdict unless no reasonable jury

could have returned a verdict adverse to the moving party. See

Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993). In making

this determination, we examine the evidence in the light most

favorable to the nonmoving party, drawing all reasonable infer-

ences in its favor. Cochrane v. Quattrocchi, 949 F.2d 11, 12 n.1

(1st Cir. 1991), cert. denied, U.S. , 112 S. Ct. 2965

3

(1992); Keisling v. Sea-Jobs for Progress, Inc., F.3d ,

, No. 93-1406, 1994 WL 92055, at *3 (1st Cir. March 29, 1994).

b. Violation of COLREGS

Appellant Crowley argues that the failure of the

GLORIA's crew to take appropriate evasive action or to call the

captain in time to avoid the collision violated the International

Regulations for Preventing Collisions at Sea (COLREGS).2 As the

evidence supports the special verdict absolving plaintiffs of

fault, we reject Crowley's challenge.

Plaintiffs' expert, Captain Jose Rivera Tolinche, a

master mariner, testified that the GLORIA followed proper col-

lision-avoidance procedure.3 Captain Rivera stated that the

GLORIA was placed "in extremis" through no fault of her own. The

in extremis rule provides that "where one ship has, by wrong

manoeuvres, placed another ship in a position of extreme danger,

2Crowley's allegations that the GLORIA violated the COLREGS
implicate the admiralty causation presumption under the "Pennsyl-
vania Rule." See The Pennsylvania, 86 U.S. (19 Wall.) 125, 136

(1874). Under the Pennsylvania Rule, a vessel shown to be in
actual violation of a collision-prevention rule bears the burden
of proving that her fault could not have been a contributing

cause of the accident. See Capt'n Mark v. Sea Fever Corp., 692

F.2d 163, 167 (1st Cir. 1982).

3Since the sailboat GLORIA was the "privileged" vessel, see

COLREGS, Rule 18(a)(iv) (power-driven vessel shall keep out of
way of sailing vessel), the "default passing rule" required her
to hold course and speed, id. Rule 17(a)(i), until it became

apparent that the BORINQUEN, the "burdened vessel," was not
taking appropriate action to avoid collision, at which time the
GLORIA was allowed to manoeuvre to avoid collision, id. Rule

17(a)(ii). At the point at which the collision could no longer
be avoided by unilateral action on the part of the BORINQUEN, the
GLORIA was required to take action to avoid a collision. See id.

Rule 17(b).

4

that other ship will not be held to blame if she has done some-

thing wrong." Puerto Rico Ports Auth. v. M/V Manhattan Prince,

897 F.2d 1, 6 (1st Cir. 1990) (citations omitted).4 Thus, there

was sufficient evidence to support the finding that plaintiffs

did not fail to follow any collision-avoidance procedure required

under the COLREGS before the GLORIA had been placed in extreme

danger, at which point any subsequent mistake on her part was

excused. See id. ("the judgment of a competent sailor in extre-

mis cannot be impugned").5

4Though Crowley does not challenge the special verdict

finding that the BORINQUEN placed the GLORIA in extremis, it

claims that the in extremis doctrine does not apply because the

GLORIA placed herself in extreme danger. See Bucolo, Inc. v. S/V

JAGUAR, 428 F.2d 394, 396 (1st Cir. 1970) (in extremis applicable

only when party asserting it was free from fault until emergency
arose). Crowley's argument is foreclosed on appeal, however, by
Captain Rivera's testimony, which formed an adequate basis for
the jury finding that "the tug BORINQUEN place[d] the GLORIA,
through no fault of her own, in a position of extreme danger .

. . ." (Emphasis added).

5Crowley now contends, for the first time, that plaintiffs'
conceded failure to establish radio contact with the BORINQUEN
violated COLREGS, Rule 2 (in complying with COLREGS, due regard
shall be had to all dangers of navigation and collision), since
the watch aboard the GLORIA sighted the BORINQUEN approximately
thirty-five minutes prior to the collision. The failure to raise
this argument below effected its waiver. See Wells Real Estate

v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 810 (1st Cir.)

("We do not reach the issue of the sufficiency of the evidence,
however, because plaintiff's counsel failed to move for [judgment
as a matter of law under Rule 50(a)] in the district court . . .
The motion must also be made with sufficient specificity to allow

the district judge to understand precisely why the evidence is

insufficient. Appellate review may be obtained only on the

specific ground stated in the motion") (emphasis added), cert.

denied, 488 U.S. 995 (1988), (citing Pstragowski v. Metropolitan

Life Ins. Co., 553 F.2d 1, 3 (1st Cir. 1977)).

5

c. Failure to Use Reasonable Care

Crowley claims that a finding of negligence was "man-

dated" because some plaintiffs lacked seafaring experience and

"did not have much time to couple together as a crew." The

plaintiffs testified to their training and experience.6 Captain

Rivera offered the professional opinion that plaintiffs were

qualified for their respective positions aboard the GLORIA, based

on their backgrounds and experience. Thus, in addition to

Crowley's failure to establish a causal relationship between the

collision and any alleged negligence on the part of the crew,

there was adequate support for a jury finding that the crew,

individually and collectively, possessed the requisite competence

and qualifications.

d. Unseaworthiness

Crowley further claims that the GLORIA was unseaworthy,

as the evidence established that her engine failed to function

when plaintiffs attempted to start it immediately prior to the

collision. Thus, Crowley argues, plaintiffs incurred contributo-

ry fault. See Gertrude Parker, Inc. v. Abrams, 178 F.2d 259 (1st

Cir. 1949) ("unseaworthiness" is ground for liability in marine

casualty). The record nonetheless substantiates the special

6Captain Havinga is a licensed deck officer in the Dutch
Merchant Marine, and a Royal Dutch Navy officer. Hagemann is a
German-certified able seafarer, whose ten years of sailing
experience included many voyages as a crewman, and one or two
trips as the skipper of a vessel similar to the GLORIA. Stach
and Van der Ark had taken courses in basic seamanship. Paschedag
had served as a crewmember on at least three prior sailing
voyages in Europe and the Caribbean, including a two-week stint
in the Aegean Sea.

6

verdict on comparative fault. Hagemann, an experienced mechanic,

testified to proper maintenance and repair of the engine.

Captain Rivera provided expert testimony that the GLORIA was

seaworthy. As Crowley has neither shown that the special verdict

on comparative fault was against the clear weight of the evi-

dence, nor that the district court erred in denying the Rule

50(b) motion for judgment as a matter of law, the liability

judgment against Crowley must stand.

2. Damages

Crowley challenges the amount of damages awarded for

economic loss, pain and suffering, and loss of enjoyment of life,

as well as the district court order denying its motion for new

trial on damages or for a remittitur. Crowley argues that the

damages awarded for economic loss exceed any rational evaluation

of the evidence, see Kolb v. Goldring, Inc., 694 F.2d 869, 871

(1st Cir. 1982), and that the awards for noneconomic injuries are

so grossly excessive as to "shock the conscience," see McDonald

v. Federal Labs., Inc., 724 F.2d 243, 246 (1st Cir. 1984) (citing

Gruenthal v. Long Island R.R. Co., 393 U.S. 156, 159 (1968)).

a. Standard of Review

Though notoriously difficult to quantify, see Rivera v.

Rederi A/B Nordstjernan, 456 F.2d 970, 975 n.8 (1st Cir.), cert.

denied, 409 U.S. 876 (1972), noneconomic damages, such as pain

and suffering and loss of enjoyment of life, "are not immune from

appellate review," Anthony v. G.M.D. Airline Servs., 17 F.3d 490,

7

494 (1st Cir. 1994) (citations omitted). But appellant bears the

8

heavy burden of establishing that an award is "grossly excessive,

inordinate, shocking to the conscience of the court or so high

that it would be a denial of justice to permit it to stand."

McDonald, 724 F.2d at 246 (citations omitted). We will not

disturb an award of damages merely because it is "extremely

generous, or [because] had we been deciding, we would have found

the damages to be considerably less," Williams v. Martin Marietta

Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir.) (citations omitted),

cert. denied, 484 U.S. 913 (1987), cited with approval in Antho-

ny, 17 F.3d at 494. Rather, we will reverse an award only if it

is so grossly disproportionate to any injury established by the

evidence as to be unconscionable as a matter of law. See Milone

v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988); Marchant

v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988);

Wagenmann v. Adams, 829 F.2d 196, 200-01 (1st Cir. 1987); Bonn v.

Puerto Rico Int'l Airlines, Inc., 518 F.2d 89, 94 (1st Cir.

1975).

b. Pain and Suffering and Loss of
Capacity for Enjoyment of Life

The lion's share (97%) of the challenged awards was for

"pain, suffering and loss of capacity for enjoyment of life."7

7The individual awards were as follows:

Pain/
Suffering,
Lost Personal Medical Lost
Enjoyment Effects Expenses Earnings

Havinga: $450,000 $27,000 $2,500 0
Havinga:

Stach: $400,000 $32,400 $1,500 0
Stach:

9

See Room v. Caribe Hilton Hotel, 659 F.2d 5, 8 n.3 (1st Cir.

1981) (pain and suffering); Gutierrez-Rodriguez v. Cartagena, 882

F.2d 553, 580 (1st Cir. 1989) (loss of enjoyment of life). The

special verdict forms did not differentiate between "pain and

suffering" and "loss of enjoyment of life." Further, there was

no objection to the jury charge, which lumped all alleged forms

of noneconomic injury: "If you find . . . for the plaintiffs you

should compensate them for any bodily injury, any resulting pain

or suffering, mental anguish and loss of capacity for the enjoy-

ment of life experiences in the past, and which you find from the

evidence that they are reasonably certain to suffer [i]n the

future from the injury in question." Further, in closing argu-

ment, plaintiffs' counsel appealed to the jury as follows,

without objection: "You have the opportunity to compensate these

five plaintiffs for the loss of the quality of their life.

Something was taken from them on April 12, 1989, and you cannot

return that . . . But you can try to compensate fairly and

justly for all their losses, for all their pain, for all their

suffering, for the loss of the quality of life, for the three

years that they have had to wait until they finally came here . .

. ."

Van der Ark: $200,000 $ 2,300 0 0
Van der Ark:

Hagemann: $300,000 $ 9,400 $7,000 0
Hagemann:

Paschedag: $200,000 $15,600 $7,000 $7,000
Paschedag:

No award was made for future medical expenses. See infra note

15.

10

Viewed in the light most favorable to the challenged

awards, see Toucet v. Maritime Overseas Corp., 991 F.2d 5, 11

(1st

Cir. 1993), the evidence relating to damages was as follows.

Plaintiffs Hagemann and Paschedag, who were standing watch aboard

the GLORIA, first saw the BORINQUEN's running lights at approxi-

mately 2:55 a.m. As the BORINQUEN changed course at 3:24 a.m.,

Hagemann anticipated that she would pass on the GLORIA's port

side in accordance with the COLREGS. As Hagemann soon realized,

however, the BORINQUEN instead was assuming a collision course

with the GLORIA, so he attempted to bring the GLORIA to star-

board. Unable to steer the GLORIA clear of the BORINQUEN without

motor power, Hagemann tried unsuccessfully to start her engine.

Paschedag frantically attempted to signal the BORINQUEN with an

air horn and a marine light, to no avail. Hagemann then yelled

for Captain Havinga and the two other crew members, who were

asleep below. Although Havinga quickly came on deck, by the time

he could take the helm and attempt evasive maneuvers the BORIN-

QUEN was within 60 feet and coming on "very fast."8

8The parties stipulated that the BORINQUEN changed course at
3:24 a.m. There was testimony that this course change placed the
GLORIA in extremis. The helmsman of the BORINQUEN testified that

the course change took "about five minutes," "more or less." At
some point between 3:24 and 3:30, Hagemann recognized that the
tug was assuming a collision course, placing the GLORIA in

extremis. Thus, as approximately one minute passed between the

narrow miss by the BORINQUEN and the first impact with the tow
barge (at 3:30), the jury reasonably could have found that the
GLORIA had no more than two to three minutes within which to
attempt to avoid the collision.

11

The BORINQUEN herself narrowly missed the GLORIA. As

the vessels passed, however, a 200-meter steel tow cable connect-

ing the BORINQUEN with its 262-foot tow barge scraped along the

deck of the GLORIA, crushing objects in its path. As the huge

barge bore down on the 65-foot GLORIA, plaintiffs could only

await the impending collision in helpless panic.9 Moments

before the initial impact at 3:30 a.m., Havinga, fearing that the

GLORIA would be dragged under the barge, ordered the crew over-

board. Before the men could respond, however, they were knocked

off their feet by the force of the first of three collisions

between the barge and the GLORIA. The GLORIA swayed 90 degrees

to the horizontal several times before righting herself, and

rapidly drifted away. The plaintiffs could see the helmsman

aboard the BORINQUEN as the barge passed them in the water, but

were unable to attract attention aboard the BORINQUEN.

Eventually the five plaintiffs made it to a small

rubber dinghy which Stach had managed to throw from the GLORIA,

her life boat having been lost in the collision. Due to their

confusion and panic, as well as the darkness and rough seas, the

crew had great difficulty reaching the dinghy, and Stach and

Paschedag nearly drowned. The dinghy was large enough for only

two or three persons, and the five plaintiffs were piled two-

deep. Havinga, Van der Ark, and Stach had lost all their cloth-

ing, and shared the little clothing worn by Hagemann and Pas-

9Approximately sixty seconds elapsed between the passing of
the BORINQUEN itself and the GLORIA's initial impact with the
trailing barge. See supra note 8.

12

chedag. The men shivered uncontrollably, their situation made

more miserable by Havinga's incontinence and the sea swells

washing over the sides of the dinghy.

At trial, each plaintiff testified to his own experi-

ence and emotional state, including shock, hysteria, panic,

desperation, and fear of death. All were concerned about sharks.

Due to his merchant marine experience, Havinga realized (and

advised Hagemann) that sharks often follow barges to feed on

scraps lost overboard. Their fears were reinforced when Van der

Ark and others observed fins around and beneath the dinghy. The

men knew that even a glancing contact with a shark's rough

exterior could puncture and sink the rubber dinghy. At the first

appearance of sharks, therefore, further efforts at paddling the

dinghy were abandoned. While awaiting rescue, on several occa-

sions plaintiffs experienced elation upon seeing an approaching

vessel (one within 300 yards), only to have their hopes dashed as

each vessel passed in the darkness. Approximately four and one-

half hours after the collision, plaintiffs were rescued by the

tug FAJARDO.

The individual plaintiffs testified to their pain and

suffering and loss of enjoyment of life following the accident.

Dr. Jose Fumero, plaintiffs' examining psychiatrist, testified,

without objection, that the plaintiffs all suffered from acute

post-traumatic stress disorder (PTSD),10 a direct result of the

10Dr. Fumero testified that PTSD is an acknowledged anxiety
disorder, see American Psychiatric Assoc., Diagnostic and Statis-

tical Manual of Mental Disorders, Third Edition, Revised, 247-49

13

accident. Dr. Fumero described the emotional injuries sustained

by each plaintiff, and testified to a "Global Assessment of

Function" (GAF) for each plaintiff, ranging from zero (virtual

vegetative state) to ninety (high function).11

The district court instructed the jury to consider

plaintiffs' pain and suffering, as well as any loss of "enjoyment

of life experiences in the past, and which you find from the

evidence that they are reasonably certain to suffer [i]n the

future." (Emphasis added). See, e.g., Gutierrez-Rodriguez, 882

F.2d at 580 (upholding damages awarded for loss of enjoyment of

life; 1983 action); Downie v. U.S. Lines Co., 359 F.2d 344, 348

(3d Cir.) (same; admiralty), cert. denied, 385 U.S. 897 (1966).

In argument, plaintiffs' counsel focused particularly on Dr.

Fumero's uncontroverted testimony relating to plaintiffs' loss of

emotional function since the accident, and on the adverse impact

this would continue to have on the quality of their lives.12

(1987), caused by trauma beyond the range of normal human exper-
ience which results in such symptoms as reexperiencing the
traumatic event; a tendency to avoid stimuli associated with the
trauma; numbing of general responsiveness; and increased arousal
(i.e., difficulty falling or remaining asleep; irritability or

outbursts of anger; difficulty concentrating; hypervigilance;
exaggerated startle response; physiologic reactivity upon expo-
sure to events reminiscent of the event (e.g., a woman previously

raped in an elevator begins to perspire profusely upon entering
an elevator)). See id. at 250.

11According to Dr. Fumero, the GAF assesses and compares an
individual's current level of emotional function with his pre-
accident level of function.

12With respect to the severity of their injuries, Dr. Fumero
testified to the diminishment in each plaintiff's pre-accident
emotional function as a result of the accident: Havinga (from 90
to 65); Stach (75 to 50); Van der Ark (85 to 60); Hagemann (90 to

14

Thus, the evidence, argument, and the unchallenged charge allowed

the jury considerable latitude to award substantial sums as non-

economic damages to compensate plaintiffs not only for their loss

of enjoyment of life during the three years immediately after the

accident, but into the indefinite future. See Gutierrez-Rodri-

guez, 882 F.2d at 580; Kokesh v. American Steamship Co., 747 F.2d

1092, 1095 (6th Cir. 1984) (substantial award "may also reflect

the evidence that [plaintiff's] . . . ability to enjoy life has

been impaired") (admiralty case).

Contrary to Crowley's attempt on appeal to characterize

these awards almost exclusively as compensation for pain and

suffering experienced at and immediately after the accident, the

noneconomic damages are largely supportable simply on the un-

controverted trial evidence that each plaintiff had already

experienced substantial deficits in emotional function and loss

of enjoyment of life which could be expected to continue into the

indefinite future. Viewed in the light most favorable to the

verdicts, Fumero's testimony reasonably enabled the jury to find

that none of the plaintiffs had regained normal emotional func-

tion by the time of trial and that though Havinga, Stach, and Van

der Ark may continue to improve, it is uncertain whether they

60); Paschedag (85 to 55). Dr. Fumero described a GAF of 65 as
"very, very low." Crowley argues that the amounts awarded to the
individual plaintiffs were disproportionate to their respective
GAFs. Dr. Fumero explained, however, that it is misleading to
compare GAFs between individuals. The GAF compares an indi-
vidual's current emotional function to his pre-accident capacity.
Moreover, the jury was entitled to weigh all the evidence in

assessing the individual awards, not merely the GAFs.

15

will ever recover their pre-accident levels of emotional func-

tion. The uncontroverted evidence also revealed that Hagemann

and Paschedag "had stabilized" well below their pre-accident

levels of emotional function and could expect no further "bene-

fits of improvement."13 Crowley chose to present no expert

testimony on loss of emotional function, loss of enjoyment of

life, or pain and suffering, nor did it challenge the jury

instruction on these noneconomic damages.

After a careful review of the record, see Coy v.

Simpson Marine Safety Equip., Inc., 787 F.2d 19, 27 (1st Cir.

1986), we are unable to say that these noneconomic damages,

though generous to be sure, were so disproportionate to the

uncontroverted evidence of "pain and suffering," severe emotional

injuries, and loss of enjoyment of life, as to shock the con-

science. See, e.g., Joia v. Jo-Ja Serv. Corp., 817 F.2d 908,

918-19 (1st Cir. 1987) (while $250,000 award, exclusively for

"pain and suffering," was "very high," it was supported by

sufficient evidence so as not to shock the conscience), cert.

denied, 484 U.S. 1008 (1988). The evidence was sufficient to

establish that plaintiffs' emotional and psychological injuries

13Crowley suggests that the jury acted irrationally by
returning the two smallest noneconomic damages awards to Hagemann
and Paschedag, the two plaintiffs with the greatest GAF differen-
tial at the time of trial. However, GAF differential was not the
only evidence going to noneconomic damages. The jury heard Dr.
Fumero's detailed clinical descriptions of the individual plain-
tiffs' mental health, as well as each plaintiff's testimony about
his own emotional response. And, of course, the jury was enti-
tled to weigh all the evidence going to each component of non-
economic damages.

16

were severe, "significantly affected" the quality of their lives,

and caused each to avoid activities in which he had engaged.14

Cf. Anthony, 17 F.3d at 494 ($566,765 award, exclusively for

"pain and suffering," held grossly disproportionate, absent,

inter alia, any "evidence [that plaintiff's] injury has rendered

him unable to perform any particular functions or engage in any

particular activities [or] otherwise interfered with his profes-

sional, recreational, or personal life") (emphasis added);

Marchant, 836 F.2d at 703-04 ($550,000 pain and suffering award

unconscionable when, inter alia, injury did not cause plaintiff

significant financial losses). Further, the jury could have

found that plaintiffs' post-traumatic stress disorders were

permanent and chronic.15 Cf. Anthony, 17 F.3d at 494 ("pain

14Dr. Fumero also testified that the plaintiffs' PTSD was
"directly related" to the accident involving the GLORIA. Cf.

Bonn, 518 F.2d at 93-94. In Bonn, the plaintiffs were three

children whose parents had been killed in a plane crash. We
found that a $1,045,000 "pain and suffering" award to the chil-
dren was "unconscionable," in significant part because their
emotional injuries were not directly related to their parents'
death. Id. at 94 ("[t]estimony and pre-accident reports conclu-

sively establish that the children exhibited many of their

present emotional problems before their parents' death." (Empha-
sis added)).
There was evidence that all these plaintiffs have greater
fear of the sea; Havinga and Stach now avoid stressful profes-
sional and personal situations; Hagemann suffered financial,
personal, and sexual problems; Van Der Ark has experienced a
lessening of academic interest; and Paschedag, who sustained the
greatest loss of emotional function, was unable to work for
approximately five months.

15Crowley argues that since no plaintiff was awarded damages
for future medical expenses, and each received only a small award

for past medical expenses, there was no evidence of "substantial
long term injuries" sufficient to justify the awards. On the
contrary, the jury reasonably could have awarded noneconomic

damages for past "pain and suffering" and emotional injury, and

17

and suffering" award vacated because, inter alia, there was "no

testimony or other evidence that [plaintiff's] current condition

is permanent").

Although Crowley now challenges its weight, Dr. Fu-

mero's expert testimony as to each plaintiff's PTSD and loss of

emotional function was admitted without objection and went

uncontroverted at trial. Thus, the jury was entitled to credit

this testimony fully. Gutierrez-Rodriguez, 882 F.2d at 579

("Against [the plaintiff's expert's] evidence, the defendants

offered no contradictory testimony. The . . . facts were uncon-

troverted and the jury was entitled to accept all of them"). See

also Fed. R. Civ. P. 35(a) (permitting, on motion and for good

cause, psychological examination of party when mental state in

controversy). Crowley merely argues that the awards for non-

economic injuries are so disproportionate to the damages compen-

sating plaintiffs for their medical expenses as to render the

awards grossly excessive, citing Betancourt v. J.C. Penney Co.,

554 F.2d 1206, 1209 (1st Cir. 1977) (vacating jury award where

noneconomic damages were 120 times greater than economic damages

for permanent "loss of capacity for enjoyment of life," without
concluding that future medical treatment was indicated. See,

e.g., Dunn v. Penrod Drilling Co., 660 F. Supp. 757, 770-71 (S.D.

Tex. 1987) (awarding $110,000 for past and future pain and
suffering, but declining to award damages for medical expenses)
(admiralty case).
Crowley also maintains that the awards were excessive
because each plaintiff showed improvement by the time of trial.
Of course, improvement would not preclude an award for "pain and
suffering," loss of emotional function, and loss of enjoyment of
life already experienced during the three years following the

accident. Nor would it preclude an award for loss of emotional
function and enjoyment of life in the future.

18

because award "simply makes no sense") (applying Puerto Rico

law). While the relationship among its various components may be

considered in evaluating the total award, see id., the primary

teaching in our cases is that damages not be grossly dispropor-

tionate to the injury. See Laaperi v. Sears, Roebuck & Co., 787

F.2d 726, 735 (1st Cir. 1986). In this case, the uncontroverted

evidence of severe PTSD, accompanied by substantial pain and

suffering and loss of enjoyment of life brought on by diminished

emotional function, which may well prove permanent, takes this

case out of the Betancourt mode.16

Finally, Crowley claims these awards are grossly

excessive compared to awards in other cases. As we have ex-

plained, "the paramount focus in reviewing a damage award must be

the evidence presented at trial . . . . Absent a most unusual

case . . . we cannot imagine overturning a jury award that has

substantial basis in the evidence." Gutierrez-Rodriguez, 882

F.2d at 579 (citations omitted) (emphasis added). An examination

of other awards upheld in our case law suggests no sufficient

basis for upsetting the present awards. See id. at 579-80

(explaining that a jury award will not be overturned "merely

because the amount of the award is somewhat out of line with

other cases of similar nature.") Indeed, our research has

16For example, there was evidence in Betancourt that if the

plaintiff had been willing to undergo treatment for a three-month
period, "she would feel 'just about completely well in her
initial condition . . . [and] will heal and live a normal life
almost free of pain.'" 554 F.2d at 1208. Not only is there no
such evidence here, but the modest injuries sustained in Bet-

ancourt were exclusively physical.

19

disclosed no sufficiently similar case to suggest, let alone

persuade, that these awards for noneconomic damages are so

excessive as to require retrial or remittitur.17

c. Economic Damages

We must now determine whether the damages awarded for

economic loss have "adequate evidentiary support." Segal v.

Gilbert Color Sys., Inc., 746 F.2d 78, 81 (1st Cir. 1984) (cita-

tion omitted). We will uphold an award for economic loss provid-

ed it does not "violate the conscience of the court or strike

such a dissonant chord that justice would be denied were the

judgment permitted to stand," Milone, 847 F.2d at 37. Under

these standards, we examine the evidence in detail, see Gru-

nenthal, 393 U.S. at 159 (appellate court must make "detailed

appraisal of the evidence bearing on damages"), and in the light

most favorable to plaintiffs, Toucet, 991 F.2d at 11.

Crowley challenges the awards for past medical expens-

es, loss of personal effects, and lost earnings, see supra note

7, as unsupported by the evidence. We agree in part. The awards

17For example, Crowley cites cases in which lesser amounts
were awarded for "pain and suffering" experienced by seamen who
perished at sea. See, e.g., Brown v. United States, 615 F. Supp.

391 (D.Mass. 1985), rev'd. on other grounds, 790 F.2d 199 (1st

Cir. 1986), cert. denied, 479 U.S. 1058 (1987); Bergen v. F/V St.

Patrick, 816 F.2d 1345 (9th Cir.), cert. denied, 493 U.S. 871

(1987). This anomaly is due, in large part, to the presumed
brevity of the pain and suffering experienced before the de-
cedent's demise, which is separate and apart from an award for
wrongful death. Moreover, as explained above, see supra at

pp.14-15, the noneconomic damages in this case were not limited
to "pain and suffering" at and immediately after the accident,
but included sustained emotional injuries, including PTSD and
plaintiffs' sustained and/or permanent loss of emotional func-
tion.

20

for past medical expenses and lost earnings are well documented

in the record. On the other hand, the individual awards for loss

of personal effects (except for the Van der Ark award) exceed the

amounts to which plaintiffs testified at trial: Havinga ($5,500

loss, awarded $27,000); Stach ($17,600 loss, awarded $32,400);

Hagemann ($5,600 loss, awarded $9,400); Paschedag ($7,000 loss,

awarded $15,600). As there was no other relevant evidence, these

awards must be pared.18 See Kolb, 694 F.2d at 871 (award for

purely economic damages is excessive as a matter of law if

unsupportable on any rational view of the evidence); Segal, 746

F.2d at 81 (same).

Therefore, absent a remittitur, we must remand for a

new trial on damages relating to loss of personal effects. See

Anthony, 17 F.3d at 495. Since the trial record clearly disclos-

es the maximum amount of damages recoverable for loss of personal

effects, however, we can calculate the remittitur ourselves.

Id.; Kolb, 694 F.2d at 875 (as defects in award "are readily

18Plaintiffs argue that a chart attached to their brief
supports the awards. The chart merely lists the total economic
damages claimed by each plaintiff, with no hint as to how the
total figure was derived. Plaintiffs concede that the chart was
not admitted in evidence. Thus, it merely served as a visual
aid. See Jack B. Weinstein & Margaret A. Berger, 5 Weinstein's

Evidence 1006[7] (Sept. 1983) (chart itself not evidence unless

admitted under Fed. R. Evid. 1006). Consequently, the chart
could provide no evidentiary support for the awards. Finally,
plaintiffs neither point to, nor have we found, any record
support for these awards for loss of personal effects, other than
plaintiffs' testimony.

21

identified and measured," remittitur more appropriate than new

trial).19 We therefore order a new trial on damages claimed by

plaintiffs Havinga, Stach, Hagemann, and Paschedag for the loss

of their personal effects and belongings, unless these plain-

tiffs, respectively, remit $21,500, $14,800, $3,800, and $8,600,

in which event their judgments shall stand affirmed as modified.

See id.; 11 Charles A. Wright & Arthur R. Miller, Federal Prac-

tice and Procedure 2820, at 133-134 (1973 & Supp. 1993).

B. THE CROSS-APPEAL

The plaintiffs cross-appeal from the denial of their

motion for attorney fees and extraordinary costs,20 and their

Rule 59(e) motion for prejudgment interest. Their claims are un-

availing.21

19Under the "maximum recovery" rule, we may condition a new
trial on the acceptance of a remittitur based on the highest
award supported by the evidence. See Liberty Mut. Ins. Co. v.

Continental Cas. Co., 771 F.2d 579 588-89 (1st Cir. 1985); see

also Marchant, 836 F.2d at 704 (noting adoption of "maximum

recovery" rule).

20Plaintiffs requested attorney fees, extraordinary costs,
and prejudgment interest in their Rule 59(e) motion to alter or
amend judgment. Motions for attorney fees are governed by Fed.
R. Civ. P. 54(d)(2), see also White v. New Hampshire Dept. of

Emp. Secur., 455 U.S. 445 (1982) (pre-Rule 54(d)(2) case holding

motion for attorney fees under 28 U.S.C. 1988 not barred by
Rule 59(e) time limits), as are costs, see Buchanan v. Stanships,

Inc., 485 U.S. 265, 267 (1988) (per curiam) (application for

costs properly viewed as Rule 54(d) motion). These requests for
fees and costs were timely under Rule 54(d)(2)(B). See id. On

the other hand, the claim for prejudgment interest is governed by
Rule 59(e). See Osterneck v. Ernst & Whinney, 489 U.S. 169, 175

(1989).

21Crowley argues that the cross-appeal is untimely. See

Fed. R. App. P. 4(a)(3) (cross-appeal may be taken within 14 days
after a timely notice of appeal, or as otherwise provided by Rule

22

Though plaintiffs claim on appeal that attorney fees

were warranted on the ground that Crowley engaged in litigation

tactics born of "premeditated bad faith," they adduced no sup-

porting evidence below. The record would not support a finding

of bad faith or fraudulent litigation tactics such as the Supreme

Court has found sufficient to warrant an award of attorney fees

as a sanction under the "inherent power" of the court. See

Chambers v. NASCO, Inc., 501 U.S. 32, , 111 S. Ct. 2123, 2140

(1991). We therefore find no abuse of discretion. See Papas v.

Hanlon, 849 F.2d 702, 703 (1st Cir. 1988); FDIC V. Sumner Finan-

cial Corp., 602 F.2d 670, 683 (5th Cir. 1979) (holding that where

bad faith is not "directly inferable from record," district court

did not abuse discretion in denying motion for extraordinary

costs and attorney fees).

Lastly, plaintiffs filed their Rule 59(e) motion for

prejudgment interest with the district court on August 7, 1992,

but did not mail it to Crowley until August 11, see Fed. R. Civ.

P. 5(b) ("[s]ervice by mail is complete upon mailing"), more than

ten days (excluding intermediate weekends and the date on which

the order was entered, Fed. R. Civ. P. 6(a)) after the judgment

had been entered on July 24. Since the Rule 59(e) motion was

4(a)). Crowley filed its notice of appeal on December 11, 1992.
On December 31, plaintiffs asked the district court to extend the
time for filing their cross-appeal, alleging that they had not
been properly served with the Crowley notice of appeal, and that
no party would be prejudiced by the late filing. By margin
order, the court granted the extension. Fed. R. App. P. 4(a)(5)
provides that the district court may extend the appeal period on
motion filed within thirty days of the expiration of the original
appeal period.

23

untimely, we lack jurisdiction to entertain the cross-appeal from

the district court order denying the Rule 59(e) motion for an

allowance of prejudgment interest. The ten-day time limitation

under Rule 59(e) is jurisdictional. Feinstein v. Moses, 951 F.2d

16, 19 (1st Cir. 1991).22

The judgment in favor of plaintiff-appellee Van der Ark

is affirmed. The judgment in favor of any plaintiff-appellee who

fails to remit damages as follows: Havinga $21,500; Stach

$14,800; Hagemann $3,800; and Paschedag $8,600, within thirty

days of entry of mandate, shall be vacated. The case is remanded

for a new trial on economic damages for loss of personal effects

and belongings or for the entry of judgments reduced in accor-

dance herewith. Costs are allowed to plaintiffs-appellees in No.

92-2479 and to defendant-appellee in No. 93-1073.

22Under settled admiralty law, moreover, plaintiffs' failure
to request a jury instruction on prejudgment interest barred
recovery. See Scola v. Boat Frances R., Inc., 618 F.2d 147, 150

(1st Cir. 1980) (prejudgment interest is "discretionary in
maritime personal injury cases, and the discretion must be
exercised by the jury").
Plaintiffs also request appellate costs and damages under
Fed. R. App. P. 38, characterizing Crowley's appeal as "frivo-
lous." We disagree. Crowley not only prevailed in part but even
its unsuccessful appellate claims are not fairly characterized as
"frivolous."

24