Dana ANTHONY, Plaintiff, Appellee,

v.

G.M.D. AIRLINE SERVICES, INC., Defendant, Appellant.

No. 93–1646.

United States Court of Appeals, First Circuit.

Heard Nov. 2, 1993.

Decided March 3, 1994.

Holly S. Harvey, with whom Kathleen M. O'Connor, Thornton, David, Murray, Richard & Davis, P.A., Juan Marina, María Emilia Picó and Bufete Rexach & Picó, were on brief for appellant.

Philip E. Roberts, with whom Harry A. Ezratty, was on brief for appellee.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TORRUELLA, Circuit Judge.

When confronted with the difficult task of determining how much in damages is too much, appellate courts inevitably hesitate to second-guess a jury's calculation of an appropriate amount. The facts of this case, however, compel us to overcome our usual reluctance. Plaintiff-appellee, Dana Anthony, was awarded $571,100 as compensation for an injury to his leg despite a dearth of evidence that the injury prevented Anthony from working as a cargo pilot or from engaging in any other activities he might otherwise enjoy. Even the most generous interpretation of the record cannot support the amount granted for Anthony's pain and suffering, which accounts for over 99% of the total award. We therefore set aside the verdict as excessive and remand for a remittitur of damages in an amount to be determined by the district court.

## I. BACKGROUND

On November 7, 1991, Anthony was struck from behind by a pallet on a loaded forklift driven by an employee of the defendant-appellant, G.M.D. Airline Services, Inc. ("GMD"). The pallet hit Anthony in the calf of his left leg and then pushed him forward, on both feet, for a short distance. Anthony suffered an abrasion on his left calf from the accident. Nurses at an airport first aid facility bandaged the wound and treated it with hydrogen peroxide, antibiotic ointment, and an ice pack. Anthony then went to a hospital where doctors took X-rays of Anthony's leg and determined that it was not fractured.

After the accident, Anthony returned home to Florida and briefly took himself off flight duty. He resumed his regular flight schedule one week later on November 15, 1991. Anthony then continued flying for nearly five months until the cargo company he worked for ceased all operations in April of 1992. With the exception of one brief trip in October of that year,[1] Anthony has not flown or worked since. At the time of the accident, Anthony was 56 years old and had worked as a pilot for thirty years.

On January 2, 1992, almost two months after the accident, Anthony went to see his regular federal aviation doctor, Doctor Perraud, because he felt pain behind his left knee. Doctor Perraud examined Anthony's leg and referred him to a cardiovascular specialist, Dr. Anthony Revilla. Anthony did not see doctor Revilla until one year later at which time doctor Revilla ran some tests and told Anthony to wear special elastic stockings, to rest, and to elevate his leg. Anthony neither sought nor received any other medical treatment.[2]

Anthony brought this suit against GMD in the United States District Court for the Dis-

---

1. Anthony testified that his renewed attempt at flying "wasn't working out too well" but gave no specific reasons why he stopped flying.

2. Anthony also testified to seeing a chiropractor, however, his counsel stated at trial that he was "not making any claim to the chiropractor, none at all." In addition, Anthony was examined by his medical expert in preparation for the trial but never claimed this was part of his treatment for the injury.

trict of Puerto Rico on June 22, 1992. In his amended complaint, Anthony claimed that because of his injury, he had sustained $3,572.98 in medical expenses and lost earnings as well as additional damages "in excess of $75,000." The amount claimed for special damages (medical related expenses and lost earnings) was adjusted to $3,433.98 in a pretrial order. During the trial, Anthony testified that he incurred a total of $1,335 in medical expenses and $47,952 in lost wages. Unlike the complaint and pretrial order, Anthony's testimony included lost wages from April 10, 1992 (when Anthony stopped flying) until the date of the trial.

Anthony testified at trial that since the accident he has experienced constant pain in his left leg for which he takes aspirin and Tylenol. Anthony also stated that he spends most of the day lying down and that he elevates his leg two or three times a day. According to Anthony, he is "totally disabled" from the accident and cannot work because of the injury to his leg. Specifically, Anthony stated that "I had to take myself off [flight] duty by the rules and regulations of the Federal Aviation Administration" ("FAA").

No evidence or testimony, however, corroborated Anthony's claim that his injury prevented him from flying or engaging in any other gainful employment. Anthony testified that the FAA refused to issue him a first class medical certificate in December of 1992 because of the injury to his leg. For each of the thirty-two years preceding the accident, Anthony had received his FAA health certification. To prove that the FAA refused to certify him because of the accident, Anthony presented a medical examination report by doctor Perraud, sent to the FAA on December 2, 1992, which mentioned Anthony's leg injury and also that Anthony suffered from hypertension, a condition unrelated to the injury. In response to Anthony's medical evaluation, the FAA sent Anthony a letter dated December 22, 1992, which expressed concern about Anthony's hypertension and requested that he undergo further evaluation of that condition and send the results to the FAA. The letter made no mention of Anthony's leg condition. The letter also said nothing about the denial of Anthony's certification. Anthony never complied with the FAA's request for additional information about his blood pressure nor did he make any subsequent attempt to obtain FAA certification.

Anthony's medical expert, Dr. José R. Pérez–Anzalota ("doctor Pérez"), a cardiovascular surgeon, testified that he examined Anthony and observed swelling and varicose veins in his left leg. In the opinion of doctor Pérez, the accident had caused thrombophlebitis in the deep veins of Anthony's left leg (also known as deep venous thrombosis ("DVT"), which is basically a trauma induced blockage in the veins). This condition led to postphlebitic syndrome which is characterized by the formation of varicose veins, swelling, pigmentation of the skin, and an increased potential for ulceration.[3] Doctor Pérez testified that the treatment for this condition was for Anthony to wear elastic stockings and to lay down for 30 minutes to one hour, four times a day, with his leg elevated. When asked how long Anthony would be able to sit or stand before having to lie down, doctor Pérez responded, "[u]sually, maybe two hours, maybe less. It depends. Each individual is different. He may have to keep in contact with his physician to evaluate his case."

Doctor Pérez concluded that Anthony's injury caused a 20% "whole body" disability. However, he did not testify as to what, if any, activities or functions Anthony's injury would prevent him from performing. Doctor Pérez also did not say whether or not Anthony's injury was permanent.

Following a trial on liability and damages, a jury found GMD negligent and assessed $571,100 in damages. The jury also found that Anthony was 39% comparatively negligent for entering a restricted area at the

3. This diagnosis was contested by GMD's expert who, noting among other things that Anthony had also developed varicose veins in the right leg and that an important diagnostic test, a venogram, revealed no evidence of DVT, concluded that the varicose vein condition was not caused by the accident. For the purposes of this appeal, however, we credit doctor Pérez' testimony and find it sufficient to prove that the accident caused the present condition in Anthony's left leg.

time of the accident and consequently reduced the award by 39%, leaving Anthony with a $348,371 award. GMD moved for a new trial and, in the alternative, a remittitur on the ground that the verdict was excessive. The district court denied the motion. GMD then brought this appeal claiming that the district judge's denial of a new trial or remittitur was improper.

## II. HOW MUCH IS TOO MUCH?

■ In review of GMD's challenge to the jury's damages award, our inquiry is limited to determining "whether the trial court abused its discretion in refusing to set aside the verdict as excessive." *McDonald v. Federal Laboratories, Inc.,* 724 F.2d 243, 246 (1st Cir.1984); *see also Toucet v. Maritime Overseas Corp.,* 991 F.2d 5, 11 (1st Cir.1993); *Joia v. Jo–Ja Service Corp.,* 817 F.2d 908, 918 (1st Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). We will find such an abuse of discretion only if the jury's verdict exceeds "any rational appraisal or estimate of the damages that could be based on the evidence before the jury." *Milone v. Moceri Family, Inc.,* 847 F.2d 35, 37 (1st Cir.1988) (quoting *Segal v. Gilbert Color Systems, Inc.,* 746 F.2d 78, 81 (1st Cir.1984) (citation omitted)); *see also Toucet,* 991 F.2d at 11. As stated in the oft-quoted *Dagnello* opinion: "We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law." *Dagnello v. Long Island R.R. Co.,* 289 F.2d 797, 806 (2d Cir.1961). *See, e.g., Grunenthal v. Long Island R.R. Co.,* 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968); *Laaperi v. Sears, Roebuck & Co.,* 787 F.2d 726, 734 (1st Cir.1986); *McDonald,* 724 F.2d at 246 n. 2. Our determination of excessiveness must be based upon the evidence of damages viewed in the light most favorable to the plaintiff. *Toucet,*

991 F.2d at 11; *Joia,* 817 F.2d at 918; *Mc-Donald,* 724 F.2d at 246.

■ We have frequently characterized the type of verdict that an appellate court may vacate for excessiveness as one that is "grossly excessive," "inordinate," "shocking to the conscience" or "so high that it would be a denial of justice to permit it to stand." *See, e.g., Toucet,* 991 F.2d at 11; *Doty v. Sewall,* 908 F.2d 1053, 1062 (1st Cir.1990); *McDonald,* 724 F.2d at 246 (citing *Grunenthal,* 393 U.S. at 159, 89 S.Ct. at 333). All of these descriptions apply to the amount awarded in the present case. The only damages incurred by Anthony that the evidence can support are $1,335 in medical expenses, $3,000 in lost earnings for one missed week of flying,[4] and the amount attributable to Anthony's pain and suffering from a condition that requires him to take aspirin, wear special stockings, and to elevate his leg several times a day. No reasonable valuation of these damages could conceivably add up to $571,100 without "shocking the conscience."

Anthony maintains that the damage award properly included amounts for lost wages from the period when he stopped flying in April of 1992 up until the trial and amounts for lost earning capacity due to his inability to work in the future. The record, however, does not support damages for past or future wages (except for the week immediately following the accident), because there is insufficient evidence to show that Anthony cannot work because of the injury to his leg. Although Anthony testified that the injury prevented and continues to prevent him from flying, his own evidence overwhelmingly contradicts this assertion.

In the first place, Anthony never testified that his leg injury physically impedes his ability to perform his job as a pilot.[5] Likewise, Anthony's expert, doctor Pérez, never described any specific functional limitations that might prevent Anthony from performing tasks required of a pilot. In fact, Anthony flew for five months after the accident until

4. Anthony estimated this figure to be $3,036 in his complaint but the court reduced it to $2,710 in the pretrial order. On cross-examination, Anthony testified to a figure of $3,000 which is the amount we use here.

5. Anthony testified that pilots need to use their legs in order to operate various airplane controls but he never claimed that he was unable to operate the controls himself.

the company he worked for ceased operations. The only reason Anthony gave for not being able to fly is that the FAA would not certify him. The FAA, however, never expressed any concern about Anthony's leg, despite the fact that doctor Perraud's medical report put the FAA on notice of the injury. The FAA only expressed concerns relating to Anthony's high blood pressure, a condition unrelated to the accident. Therefore, if there is any reason to believe that Anthony could not obtain an FAA health certification—and the record does not even establish that the FAA would, in fact, deny such a certification were Anthony to apply for one—it would be because of Anthony's hypertension and not because of the injury caused by GMD. Furthermore, Anthony presented no evidence regarding wage rates and projected working hours from which a jury could estimate lost future earnings. We consequently see no basis for awarding Anthony damages for lost earnings or lost capacity to earn in the future. See *Quiñones-Pacheco v. American Airlines, Inc.*, 979 F.2d 1, 6–7 (1st Cir.1992) (To claim loss of earning capacity, a plaintiff "must offer evidence from which a jury may reasonably determine the annualized stream of income that the plaintiff, uninjured, would probably have earned, and contrast it, over the period of proven disability, to a similar forecast of what the injured plaintiff's earnings are likely to be."); *Parra v. Atchison, T. & S.F.R. Co.*, 787 F.2d 507, 509 (10th Cir.1986) ("[E]xpert medical testimony is necessary to establish that a loss of future earnings capacity was *caused* by such a non-obvious injury.").

Out of the $571,100 verdict, Anthony only established, according to the most generous interpretation of the evidence, $1,335 in medical expenses and $3,000 for one lost week of work. That leaves Anthony with a whopping $566,765 in damages for pain and suffering. Although it is admittedly difficult to place a value on the pain and suffering of another individual, *see Milone*, 847 F.2d at 37 (citing *Wagenmann v. Adams*, 829 F.2d 196, 215 (1st Cir.1987)); *McDonald*, 724 F.2d at 247, such amounts are not immune from appellate review. *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1038–41 (3d Cir. 1987); *Rivera v. Rederi A/B Nordstjernan*,

456 F.2d 970, 975 n. 8. (1st Cir.), *cert. denied*, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972). In this case, an award of $566,765 for Anthony's pain and suffering is "so grossly disproportionate" to his injury "as to be unconscionable." *Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695, 704 (1st Cir.1988); *see also Laaperi*, 787 F.2d at 735–36; *Bonn v. Puerto Rico Int'l Airlines, Inc.*, 518 F.2d 89, 94 (1st Cir.1975).

Anthony suffers from pain in his left leg and the inconvenience of having to lie down several times a day to elevate the leg. According to doctor Pérez, Anthony has a 20% whole body disability and cannot stand or sit for prolonged periods of time. There is no evidence, however, that Anthony's injury has rendered him unable to perform any particular functions or engage in any particular activities; nor is there evidence that the injury has otherwise interfered with his professional, recreational, or personal life.

The injury to Anthony's leg is not particularly severe. Most notably, it required no major medical treatment. Aside from the initial administration of first aid and the subsequent referral by doctor Perraud, Anthony's entire medical treatment consisted of one visit to a doctor who prescribed elastic stockings and rest. Secondly, Anthony's pain is not so severe as to require anything more powerful than aspirin or Tylenol. Furthermore, there is no testimony or other evidence that Anthony's current condition is permanent. Although it would not be unreasonable for the jury to conclude that Anthony's pain and need to lie down will persist for some time in the future, Anthony's expert never stated or even implied that the condition in Anthony's left leg was permanent. On the contrary, doctor Pérez described Anthony's treatment as a "long, tedious *process*" (emphasis added), implying that the treatment would lead to an improvement in Anthony's condition over time.

Anthony maintains that GMD's own expert testified that Anthony's varicose veins were incurable. Quite the opposite is true. The expert stated that Anthony's condition could be cured but that the varicose veins would return after treatment because, in the ex-

pert's opinion, the condition was caused by disease and not by trauma from the accident. While a reasonable jury could conclude that Anthony's postphlebitic syndrome and accompanying varicose veins may persist, there is nothing in the record to support a finding that Anthony will experience pain and be forced to lie down several times a day for the rest of his life.

We conclude, therefore, that the nature of Anthony's injury cannot justify a pain and suffering award that is over one hundred times larger than the $1,335 in out of pocket expenses and $3,000 in lost wages that Anthony incurred. *See Betancourt v. J.C. Penney Co.,* 554 F.2d 1206, 1209 (1st Cir.1977) ("The award for pain, suffering and such other intangibles as are permitted under Puerto Rican law would be roughly one hundred times the amount of past and future medical bills. We think such an award simply makes no sense. We cannot, in conscience, allow it to stand."). In sum, the minimal severity of Anthony's injury and the lack of evidence concerning any functional limitations—combined with the fact that Anthony went back to work one week after the accident, continued working until his employer ceased operating, and incurred only $1,335 in medical expenses—convinces us that $571,100 in total damages is excessive as a matter of law. *See, e.g., Marchant,* 836 F.2d at 703–04 (finding $600,000 excessive for wrist injury that would require daily heating and soaking and future physical therapy but did not detrimentally affect employment prospects); *Betancourt,* 554 F.2d at 1209–10 (finding $60,000 excessive for shoulder injury that would continue to cause pain but would not prevent plaintiff from working); *Gautreaux v. Insurance Co. of North America,* 811 F.2d 908, 913–16 (5th Cir.1987) (finding $483,000 excessive for knee injury that left plaintiff with a functional disability but did not prevent him from engaging in certain types of employment). Accordingly, we set aside the award.

## III. THE REMEDY

In choosing the appropriate disposition of this case, we have the option of selecting a reduced damages figure ourselves or remanding the case to the district court for a determination of damages. *See Marchant,* 836 F.2d at 704 & n. 7. We choose the latter. Although we find the damages awarded to Anthony to be excessive as a matter of law, we decline to set a specific amount for remittitur as we have the option of doing under the "maximum recovery rule." *See Seidman v. American Airlines, Inc.,* 923 F.2d 1134, 1141 (5th Cir.1991) (finding that appellate courts can reduce an excessive verdict to the maximum amount the jury could have properly awarded as a matter of law); *Marchant,* 836 F.2d at 704 (noting the First Circuit's adoption of the maximum recovery rule) (citing *Liberty Mutual Ins. Co. v. Continental Casualty Co.,* 771 F.2d 579, 588 (1st Cir. 1985)).

The bulk of the damages in this case involves compensation for pain and suffering. Normally, this type of damages, which does not involve any measurable economic loss, is particularly difficult to estimate upon a mere examination of the record. In the present case, the difficulty is compounded by the fact that nothing in the record suggests or even hints at what a maximum allowable award might be.[6] *Compare Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 973–74 (7th Cir.1983) (basing remittitur on $10 per day figure suggested by plaintiff's counsel as appropriate pain and suffering damages) *with Gautreaux,* 811 F.2d at 915–16 (remanding for a new trial on damages because the court was "unable to determine loss of future earnings") *and Betancourt,* 554 F.2d at 1209 n. 5 (reversing for a new trial on damages instead of ordering a remittitur because the estimation of the proper award "would rest solely on speculation").

---

6. GMD suggests a figure of $75,000 as an appropriate maximum recoverable amount because Anthony estimated his damages to be "in excess of $75,000.00" in his amended complaint. We do not find this figure to be particularly significant. The words "in excess of" indicate that Anthony intended this number to be a floor not a ceiling. In addition, GMD presents no legal authority for the proposition that an amount stated in the complaint, without being referred to at trial, should be used as a guide for estimating pain and suffering damages on appeal. We do not mean to suggest, however, that $75,000 is necessarily an inappropriate amount.

Instead of setting our own figure for remittitur, we remand this case to the trial judge with instructions to select a figure in our stead. Having presided over the trial and observed Anthony and the other witnesses first hand, the district court judge is in the best position to assess the evidence and set an amount for remittitur. *Cf. Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 371 (7th Cir.1993) (remanding for the calculation of a remittitur by the district court); *Peoples Bank and Trust v. Globe Int'l Publishing, Inc.*, 978 F.2d 1065, 1071 (8th Cir. 1992) (remanding for a "substantial remittitur" of compensatory damages).

■ We recognize that GMD opposes this result. GMD argues on appeal that certain improper remarks by Anthony's counsel during closing argument necessitate a new trial on damages because the remarks infected the jury's verdict with passion and prejudice. *See Mason v. Texaco, Inc.*, 948 F.2d 1546, 1561 (10th Cir.1991) ("It is well settled that mere excessiveness in the amount of an award may be cured by a remittitur, whereas excessiveness which results from jury passion and prejudice may not be so cured. In that case, a new trial is required."), *cert. denied*, — U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); *see also De León López v. Corporación Insular de Seguros*, 931 F.2d 116, 125 (1st Cir.1991); *Seidman*, 923 F.2d at 1140. GMD makes no claim of error,[7] however, and does not assert that the alleged remarks contaminated the jury's liability findings. *Cf. De León López*, 931 F.2d at 125 (noting that the rule against remittitur in cases of tainted jury verdicts "protects against the potential contamination of a jury's *liability* findings") (emphasis added); 11 Wright and Miller, *Federal Practice and Procedure*, § 2815 (1973) (same); J. Moore, *Moore's Federal Practice*, 6A ¶ 59.08[7] (1993) (same). Therefore, we find it unnecessary in the present case to review the

effect on the jury of potentially prejudicial comments by opposing counsel simply because we found the verdict to be excessive as a matter of law.

Instead, we hold that Anthony should be given the opportunity to accept a very substantially reduced verdict before subjecting both parties to a new trial. Of course, Anthony may reject the district court's remittitur offer in which case GMD's desired remedy, a new trial on damages, would result.[8]

*Accordingly, the verdict of the jury as to damages is set aside, the denial of GMD's motion for remittitur is vacated, and the case is remanded to the district court for the determination of a very substantial remittitur of the damages in an amount not inconsistent with this opinion. A new trial, on damages only, shall be ordered if Anthony decides not to remit the amount determined by the district court.*

---

7. GMD failed to object to the alleged improper remarks at trial and acknowledges that its claim of error is waived on appeal. Although such claims can still be reviewed for "plain error," we conduct no such analysis in this case because GMD "does not claim that by permitting counsel to make improper and prejudicial remarks the trial court committed plain error."

8. It is suggested that counsel seek the aid of the Civil Appeals Management Program to attempt a settlement of this matter before causing their clients to incur additional litigation expenses.