Kenneth L. BRAYMAN, Kerrie Brayman, Individually and as PPA for Jonathan Brayman, Jaqueline Brayman, Lawrence Brayman, and Madeline Brayman, Plaintiffs,

v.

**99 WEST, INC., Defendant.**

**No. Civ.A. 98–11413–MBB.**

United States District Court, D. Massachusetts.

Oct. 3, 2000.

Robert V. Costello, Schneider, Reilly, Zabin & Costello, Boston, MA, for Kenneth L. Brayman, Kerrie Brayman, Jonathan Brayman, Lawrence Brayman, Madeline Brayman, plaintiffs.

James L. Frederick, Frederick & Associates, Brookline, MA, Richard A. Zucker, Frederick And Associates, Brookline, MA, for 99 West Inc., defendant.

**MEMORANDUM AND ORDER RE: DEFENDANT, 99 WEST, INC.'S MOTION FOR REMITTITUR OR FOR NEW TRIAL ON DAMAGES (DOCKET ENTRY # 35); PLAINTIFFS' MOTION TO AMEND JUDGMENT TO INCLUDE PREJUDGMENT INTEREST AND COSTS (DOCKET ENTRY # 30)**

BOWLER, United States Magistrate Judge.

On April 12, 2000, this court conducted a hearing on the motion for a remittitur or for a new trial on damages filed by defendant 99 West, Inc. ("99 West" or "defendant") (Docket Entry # 35) and the motion of plaintiffs Kenneth L. Brayman ("Dr. Brayman"), Kerrie Brayman, individually and as PPA for Jonathan Brayman, Jaqueline Brayman, Lawrence Brayman, and Madeline Brayman (collectively: "plaintiffs") to amend the final judgment to include prejudgment interest and costs (Docket Entry # 30). At the hearing, this court heard argument on these two motions as well as the bills of costs filed by the parties (Docket Entry ## 31 & 36). At the close of the hearing, this court took the motions for a remittitur and to amend the final judgment (Docket Entry ## 30 & 35) under advisement. (Docket Entry # 37).

On June 20, 2000, this court issued a Memorandum and Order denying the parties' bills of costs (Docket Entry## 31 & 36) without prejudice due to the lack of adequate documentation and verification. (Docket Entry # 42). As to the motion to amend to include prejudgment interest,

this court denied the motion without prejudice to the extent it also sought an award of costs and reserved ruling on the remaining portion of the motion until issuance of this Memorandum and Order. The remaining portion of the motion (Docket Entry # 30), which seeks an award of prejudgment interest on the $25,000 damages award, is therefore ripe for review.

Finally, on June 29, 2000, this court heard additional argument from the parties with respect to the motion for a remittitur or a new trial. The June 20, 2000 Memorandum and Order directed the parties to address the factors noted by the First Circuit in *Smith v. Kmart Corporation,* 177 F.3d 19, 31 (1st Cir.1999), in distinguishing *Anthony v. G.M.D. Airline Services, Inc.,* 17 F.3d 490, 493 (1st Cir. 1994).

At the June 29, 2000 hearing, plaintiffs' counsel distinguished the factors used in *Smith* and *Anthony* on the basis of the comparatively smaller damages award of $25,000 in the case at bar. He also conceded the absence of any permanent injury to Dr. Brayman's throat. In addition, plaintiffs' counsel proffered a number of cases wherein the plaintiffs purportedly received comparable awards for similar injuries. Citing *Anthony v. G.M.D. Airline Services, Inc.,* 17 F.3d at 495 (noting that excessive award for the plaintiff was "over one hundred times larger than the" out of pocket expenses and lost wages), plaintiffs' counsel pointed out that the present award was only an estimated 50 times larger than the $500 in medical expenses.[1] In contrast, defendant's counsel cited various cases[2] and reiterated that there was no

---

[1] As acknowledged by plaintiffs' counsel, however, there was no evidence that Dr. Brayman incurred $500 in medical expenses due to the injuries to his throat. Although the jury heard defendant's counsel in opening statement represent that the Falmouth Hospital's bills totaled $500, there was no other reference to the amount of Dr. Brayman's medical bills for his throat, including the cost of the computerized tomography examination ("CT scan"), or Dr. Erica R. Thaler's treatment. Accordingly, it is improper to rely on such a comparison.

[2] Defendant's counsel cited two cases, *McClam v. City of Norfolk Police Department,* 877 F.Supp. 277 (E.D.Va.1995), and *Bradley v. Carydale Enterprises,* 730 F.Supp. 709 (E.D.Va.1989), cited by the Fourth Circuit in *Hetzel v. County of Prince William,* 89 F.3d 169, 173 (4th Cir.1996), *rev'd,* 523 U.S. 208, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998). Because the cases involved injuries different from those of Dr. Brayman as well as different locations and dates of trial, *see Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 579 (1st Cir.1989), discussed *infra,* they were not particularly helpful. *See McClam v. City of Nor-*

evidence of any out of pocket losses, medical bills, treatment costs, lost wages, loss of earning capacity and no permanent injury.

## I. DEFENDANT, 99 WEST, INC.'S MOTION FOR REMITTITUR OR FOR NEW TRIAL ON DAMAGES (DOCKET ENTRY # 35)

This personal injury action stems from a June 1, 1996 incident at The 99 Restaurant and Pub ("The 99 Restaurant") in Mashpee, Massachusetts. On June 1, while having lunch at the restaurant with his stepfather, Dr. Brayman ingested a piece of glass while eating mashed potatoes.[3] The glass immediately became lodged around his left tonsil and soft palate.

Dr. Brayman, a 45 year old surgeon specializing in kidney transplantation at the Hospital of the University of Pennsylvania ("HUP"), received his medical degree in 1981 from the University of Pennsylvania where he completed his residency in 1989. In 1989 Dr. Brayman also received a doctor of philosophy degree in experimental pathology from the University of Pennsylvania. Between 1989 and 1991 Dr. Brayman was a fellow in transplant surgery at the University of Minnesota, one of the largest transplant programs in the country. At the present time, in addition to his duties as a transplant surgeon, he is an associate professor of surgery, medicine and pediatrics at the University of Pennsylvania.

According to Dr. Brayman's testimony, on June 1 he initially felt something in his throat, developed pain and knew there was a foreign body in his throat. Trying not to panic, he unsuccessfully attempted to dislodge the item by coughing. He then extracted the item manually. What he saw was an "unbelievable piece of glass" that was one and a half inches in length and one quarter inch in diameter. The glass was sharp and had blood on it. Dr. Brayman went to the restroom and looked into the back of his throat in a mirror. There, he saw what he described as a laceration or puncture wound.

After bringing the issue to the attention of the waitress, Dr. Brayman went to the emergency room of the Falmouth Hospital. Diagnosed with a puncture wound to his throat, Dr. Brayman was discharged the same day with a prescription.

During the next few days, Dr. Brayman experienced an irritation or soreness in his throat. He also noticed swelling in his neck and pain which would intermittently resolve and then return.

During the weeks following the incident, Dr. Brayman continued to suffer intermittent pain similar to a sore throat, inflammation, fever and an infection. The pain and inflammation or swelling were located in the left peritonsillar region and the left side of Dr. Brayman's neck. He characterized the swelling as chronic inflammation in his throat occurring intermittently over a six week period of time. He took medication for the condition on an intermittent basis.[4]

Sometime prior to his July 19, 1996 hospitalization, Dr. Brayman made arrangements to see Dr. Erica R. Thaler ("Dr. Thaler"), an ear, nose and throat specialist at HUP. Dr. Brayman proved unable to keep the appointment because he was hos-

---

folk Police Department, 877 F.Supp. at 284 (bench trial wherein court awarded $15,000 for emotional distress and humiliation, in addition to $900 damages for tangible losses, to the plaintiff, a police officer alleging retaliatory discrimination); Bradley v. Carydale Enterprises, 730 F.Supp. at 726–727 (bench trial wherein court awarded $9,000 for injuries suffered by the plaintiff from verbal abuse, use of racial epithets and eviction attempt in racial discrimination action).

3. For purposes of ruling on defendant's motion for remittitur or a new trial on damages, this court views the evidence in plaintiffs' favor. This summary of the evidence is not exhaustive and, in reaching a ruling, this court considered all of the evidence admitted during the three day trial.

4. In contrast, Dr. Erica R. Thaler's initial visit note states that Dr. Brayman "has not been on antibiotics" and "has not had any fevers." (Ex. B).

pitalized on July 19 due to a deep vein thrombosis ("DVT") and possible pulmonary embolism.

On July 18, shortly before his hospitalization, Dr. Brayman began experiencing back pain. The pain persisted and during the early morning of July 19, he went to the emergency room of the Bryn Mawr Hospital. He was admitted and diagnosed with abdominal pain and a possible pulmonary embolism.[5] At his request, Dr. Brayman was transferred to HUP where he was hospitalized until July 26.

At HUP, Dr. Brayman was diagnosed with DVT and placed on Heparin followed by Coumadin.[6] The DVT stabilized at the hospital and he was discharged "with no evidence of residual deep vein thrombosis." (Ex. D). Viewing the record in Dr. Brayman's favor, he also suffered a pulmonary embolism on July 19.[7]

Dr. Brayman theorized that he sustained an infection as a result of the June 1 injury at The 99 Restaurant. He opined, to a reasonable degree of medical certainty, that the DVT and pulmonary embolism he experienced on July 19 were causally related to the throat inflammation he suffered secondary to the June 1 injury at The 99 Restaurant.

While hospitalized, Dr. Brayman had a CT scan of his neck. According to the radiology report, the CT scan showed multiple calcifications in the right and left tonsils as well as in the soft palate which "likely represent the sequella of prior inflammatory disease." (Ex. D).

Dr. Thaler visited Dr. Brayman during his hospitalization and dictated a note reflecting her consultation. Her note describes the glass as "long" and states that Dr. Brayman had residual swelling and erythema of the left tonsil after the June 1 incident. As set forth in the note, Dr. Brayman's discomfort was "persistent in the left tonsil area with a feeling of fullness:" (Ex. B). According to Dr. Thaler, the increased densities noted in the CT scan could either reflect "a calcification from chronic infection or silicon from glass." (Ex. B). Her impression was that Dr. Brayman had "a trauma to the soft palate and left tonsil from a glass shard with possible retained glass in the left tonsillar parenchyma." (Ex. B).

During the three day trial, the jury heard extensive testimony concerning the relationship, if any, between the June 1 damage to Dr. Brayman's throat and his subsequent July 19 hospitalization and diagnoses of DVT and possible pulmonary embolism. Testifying as his own expert, Dr. Brayman believed that the puncture wound to his throat resulted in an infection and an inflammatory condition. He opined that his DVT directly related to the persistent inflammation in his throat from the June 1 incident.

Defendant's experts, Dr. David C. Brewster and Dr. Leonard Ellman, two eminently qualified physicians,[8] dismissed and

---

5. The diagnosis in the medical records reads, "Abdominal pain, rule out pulmonary embolism." (Ex. C). The medical history notes in the Bryn Mawr Hospital's medical records further reflect that, Dr. Brayman "denies . . . cough or sore throat." (Ex. C).

6. According to Dr. Brayman, not a day goes by that he doesn't worry about having another DVT. According to Dr. Brayman, the consequences of DVT include developing post phlebitic syndrome and recurrent episodes of DVT.

7. A pulmonary embolism is an embolism which breaks off from the primary site of the blood clot and travels to the lung.

8. Dr. David C. Brewster ("Dr. Brewster") is a board certified physician in general surgery with subspecialty training in vascular surgery. He is a clinical professor of surgery at Massachusetts General Hospital and the Harvard Medical School. Dr. Leonard Ellman is a board certified physician in internal medicine and in hematology. A former director of the hematology laboratories at Massachusetts General Hospital, he is currently in clinical practice on a full time basis. He is also a senior physician at Massachusetts General Hospital.

Dr. Brewster opined, to a reasonable degree of medical certainty, that the cause of Dr. Brayman's DVT is not identifiable or, stated otherwise, is idiopathic where no definite cause can be established. Dr. Brewster did not believe that Dr. Brayman's June 1 injury was causally related to his DVT.

discredited any such causal relationship. The jury believed defendants' experts inasmuch as the jury found that Dr. Brayman did not prove that defendant's negligence was a proximate cause of his DVT and/or pulmonary embolism.[9] Nevertheless, as pointed out by defendant, the jury heard the "highly prejudicial" evidence of Dr. Brayman's DVT and pulmonary embolism, his five day hospitalization, his subsequent three to four week convalescence at home, and his persistent worry and anxiety about his DVT and pulmonary embolic condition.[10] Defendant also correctly notes there was no evidence about the medical bills for the June 1 emergency room visit.[11]

Defendant seeks a remittitur or a new trial on damages because the jury's $25,000 award to Dr. Brayman on the negligence count is excessive. Defendant posits that the aforementioned extensive and allegedly prejudicial testimony misled the jury resulting in an excessive award for the relatively minor throat injury.

## DISCUSSION

 Federal law governs the issue of whether to order a remittitur or a new trial on damages in a diversity case. *Reyes–Garcia v. Rodriguez & Del Valle, Inc.*, 82 F.3d 11, 14–15 (1st Cir.1996); *accord Blinzler v. Marriott International, Inc.*, 81 F.3d 1148, 1161 (1st Cir.1996) (same). Viewing the evidence in the light most favorable to plaintiffs, *Velazquez v. Figueroa–Gomez*, 996 F.2d 425, 428 (1st Cir.), *cert. denied*, 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993), this court is "obligated ... to grant a remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" *Eastern Mountain Platform Tennis, Inc. v. Sherwin–Williams Company, Inc.*, 40 F.3d 492, 502 (1st Cir.1994) *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 256 (1995); *accord Anthony v. G.M.D. Airline Services, Inc.*, 17 F.3d 490, 493 (1st Cir.1994) (setting forth same standard). A jury's award of damages "will withstand scrutiny unless it is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" *Blinzler v. Marriott International, Inc.*, 81 F.3d at 1161. As explained by the court in *Mejias–Quiros v. Maxxam Property Corporation*, 108 F.3d 425 (1st Cir.1997), the "general language ('rational basis') is given content by cases declaring that the verdict should stand unless it is 'grossly excessive,' 'inordinate,' 'shocking to the conscience of the court,' or 'so high that it would be a denial of justice to permit it to stand.'" *Mejias–Quiros v. Maxxam Property Corporation*, 108 F.3d at 428.

Similarly, Dr. Ellman testified that Dr. Brayman's June 1 injury is unrelated to his DVT. According to Dr. Ellman, there is no supporting evidence in the medical literature that a throat inflammation causes DVT. In Dr. Ellman's opinion, the cause of Dr. Brayman's DVT is unknown or, in other words, idiopathic.

9. In particular, the jury answered "No" to the following special verdict question:

Do you find from a preponderance of the evidence that Dr. Brayman has proven that the negligence of the defendant, 99 West, Inc., was a proximate cause of Dr. Brayman's deep vein thrombosis and/or pulmonary embolism?

10. According to Dr. Brayman, his DVT condition makes him feel that he is constantly putting himself at risk.

11. At trial plaintiffs did not seek damages for medical bills, lost wages or loss of earning capacity. Accordingly, the jury was not instructed to include these elements in any damages award. There was no evidence of the medical bills for either the June 1 or the July 19 through 26 hospitalizations. The majority of the testimony and evidence heard by the jury concerned Dr. Brayman's DVT and pulmonary embolism as well as the causal relation, if any, between the June 1 injury and resulting inflammation and Dr. Brayman's DVT and possible pulmonary embolism.

Also at trial, defendant stipulated to its negligence but vigorously contested the extent of the damages resulting from the June 1 incident. As discussed in open court, defendant's stipulation mooted plaintiffs' res ipsa "claim" in the complaint. This court also dismissed the children's loss of consortium claims.

██ Defendant, as the party challenging the award, "bears a heavy burden of showing that an award is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 532, 145 L.Ed.2d 412 (1999); *accord Velazquez v. Figueroa–Gomez,* 996 F.2d at 428 (noting that standard "places an enormous burden on the party challenging the award"). Furthermore, the present award involves assessment of intangible, noneconomic losses,[12] "a matter 'peculiarly within the jury's ken.'" *Smith v. Kmart Corporation,* 177 F.3d 19, 30 (1st Cir.1999); *accord Velazquez v. Figueroa–Gomez,* 996 F.2d at 428 (same). Thus, the "'disinclination to second-guess a jury's evaluation of the proper amount of damages is magnified where,'" as here, "'the damages entail a monetary valuation of intangible losses.'" *Blinzler v. Marriott International, Inc.,* 81 F.3d at 1161 (further noting disinclination to second guess trial judge who, having seen and heard witnesses "'first hand, accepts the jury's appraisal'"); *see generally Air Safety, Inc. v. Roman Catholic Archbishop of Boston,* 94 F.3d 1, 5 n. 9 (1st Cir.1996) (according broader discretion to trial judge's affirmation of damages award involving intangible injuries while noting trial judge's greater familiarity with witnesses' demeanor at trial); *De Leon Lopez v. Corporacion Insular de Seguros,* 931 F.2d 116, 125 (1st Cir.1991) (noting difficulty of quantifying "money damages for intangible losses").

██ In addition, uncertainty as to the amount of pain and suffering and loss of enjoyment of life and accompanying fright at the time of the injury and thereafter as a natural consequence of the injury does not bar Dr. Brayman from recovering a generous damages award. *See Air Safety, Inc. v. Roman Catholic Archbishop of Boston,* 94 F.3d at 4. Furthermore, damages for pain and suffering are not readily "'susceptible to proof through a dollar amount.'" *Mejias–Quiros v. Maxxam Property Corporation,* 108 F.3d at 428. Accordingly, "courts readily tolerate estimates by the jury based on a description of the injury." *Mejias–Quiros v. Maxxam Property Corporation,* 108 F.3d at 428.

██ The instructions advised the jury that if they found that defendant's negligence caused Dr. Brayman's injuries then they could award him damages for such injuries. In answering the special verdict questions, the jury found no such causal connection between defendant's negligence and Dr. Brayman's DVT and/or pulmonary embolism.[13] Hence, the $25,000 damages award for the injuries to Dr. Brayman's throat should not have included damages compensating Dr. Brayman for his DVT and pulmonary embolism. *See, e.g., Air Safety, Inc. v. Roman Catholic Archbishop of Boston,* 94 F.3d at 5 (positing that excessive jury award on counterclaim for negligent performance of contractual obligation to remove asbestos at six schools

12. The jury awarded $25,000 to Dr. Brayman due to defendant's negligence for the injuries to his throat. It also found that defendant breached its implied warranty of merchantability. The jury, however, refused to award Dr. Brayman any damages for his DVT or pulmonary embolism. They also declined to award Kerrie Brayman any damages for her loss of consortium.

Because plaintiffs decided to forego seeking certain elements of damages during trial, this court instructed the jury that damages for defendant's negligence only consisted of past and future pain and suffering as well as loss of enjoyment of life. In particular, the instructions allowed the jury to compensate Dr. Brayman for bodily injuries and any resulting past and future pain and suffering, embarrassment, anxiety, mental anguish and loss of enjoyment of life. Similar to the instruction given in *Havinga,* the jury charge and the special verdict form did not differentiate between the forms of noneconomic injuries. *See Havinga v. Crowley Towing and Transportation Company,* 24 F.3d 1480, 1485–1486 (1st Cir.1994). In sum, the only elements of damages awarded in the lump sum amount of $25,000 consisted of past and future pain and suffering and loss of enjoyment of life.

13. See footnote number 12.

stemmed from jury's effort to compensate the defendant, parents and students for noncompensable personal injuries lacking evidentiary foundation); *Laaperi v. Sears, Roebuck & Company, Inc.,* 787 F.2d 726, 735 (1st Cir.1986) (sister, injured in fire, could not recover compensation for the grief resulting from the deaths of her brothers in fire). Defendant submits that the excessive verdict stems from the extensive, prejudicial testimony concerning Dr. Brayman's DVT and possible pulmonary embolism.

Although the testimony throughout the trial primarily concerned Dr. Brayman's DVT and possible pulmonary embolism,[14] the jury's verdict was not an impermissible effort to compensate Dr. Brayman for his DVT and possible pulmonary embolism. As summarized *infra,* there was ample evidence for the jury to conclude that Dr. Brayman suffered a significant amount of anxiety at the time of the June 1 incident and in the weeks prior to his hospitalization. The $25,000 verdict is not a large amount of money and is amply supported by Dr. Brayman's credible testimony as to the events on June 1 and the injuries to his throat in the weeks thereafter. The jury had the opportunity to compensate Dr. Brayman for his DVT and pulmonary embolism by answering affirmatively special verdict questions two and four. Their decision not to award such damages belies their need or desire to include such damages in the $25,000 award.

Nevertheless, the evidence demonstrates that the award was extremely generous. Dr. Brayman did not forego enjoying any particular activities, professional or personal, as a result of the injuries to his throat. There is no indication that the throat injuries caused Dr. Brayman to forego performing any surgical operations or participating in his usual physical, recreational or social activities. *See Anthony v. G.M.D. Airline Services, Inc.,* 17 F.3d at 494 (setting aside damages award and finding no evidence that injuries rendered Anthony "unable to perform any particular functions or engage in any particular activities"); *cf. Smith v. Kmart Corporation,* 177 F.3d at 31 (upholding pain and suffering damages awarded to Smith where she was unable to engage in physical activities she formerly enjoyed, including dancing and aerobics, and no longer able to maintain normal social relationships); *Havinga v. Crowley Towing and Transportation Company,* 24 F.3d 1480, 1487 (1st Cir.1994) (upholding damages awarded and characterizing the plaintiffs' emotional and psychological injuries as "severe" causing "each to avoid activities in which he had engaged").

The medical treatment for the throat injuries was short-lived, consisting of the Falmouth Hospital emergency room visit and the single visit with Dr. Thaler.[15] In addition, there was no permanent scar resulting from the throat injuries. *See Smith v. Kmart Corporation,* 177 F.3d 19, 31 (1st Cir.1999) (distinguishing *Anthony* inasmuch as injury did not require major medical treatment, lack of permanent injury and lack of evidence that injury prevented the plaintiff from engaging in any activities or interfered with the plaintiff's professional, recreational or personal life). Indeed, plaintiffs' counsel forthrightly and accurately conceded that Dr. Brayman's

---

**14.** For example, without reiterating the testimony which this court has fully reviewed and partially summarized *supra,* the jury heard Dr. Brayman testify about the daily anxiety and worry he experiences about having a second thrombotic event. Kerrie Brayman's testimony likewise focused on the effects of the DVT and pulmonary embolism on herself and her husband.

**15.** On June 1, Dr. Brayman received treatment for the throat injuries in the emergency room but did not stay overnight at the Falmouth Hospital. *Cf. Laaperi v. Sears, Roebuck & Company, Inc.,* 787 F.2d at 734 (noting that the plaintiff remained in the hospital for three week period but still finding pain and suffering damages excessive). Like the plaintiff in *Anthony,* Dr. Brayman's throat injuries required no significant medical treatment. *See Anthony v. G.M.D. Airline Services, Inc.,* 17 F.3d at 494.

throat injuries were not permanent. They also did not continue for a long period of time. *See Bullard v. Central Vermont Railway, Inc.,* 565 F.2d at 197 (finding $35,000 excessive for foot injury which caused pain, disability and lost earnings for several months but did not continue "to any substantial degree thereafter"); *cf. Havinga v. Crowley Towing and Transportation Company,* 24 F.3d at 1487 (approving damages award while noting that jury could have found the plaintiffs' "disorders were permanent and chronic").

■ Furthermore, no mental health expert testified about Dr. Brayman's emotional and mental injuries caused by the ingestion of the shard of glass. Although expert testimony from a mental health expert is not required, the lack of such evidence is relevant to the amount of the damages award. *See Koster v. Trans World Airlines, Inc.,* 181 F.3d at 35 (reviewing whether damages for emotional distress were excessive); *Sanchez v. Puerto Rico Oil Company,* 37 F.3d 712, 724 (1st Cir.1994) (generally noting that expert testimony "ordinarily is not required to ground money damages for mental anguish and emotional distress"); *see also Smith v. Kmart Corporation,* 177 F.3d at 32 (noting lack of expert testimony as to the plaintiff's emotional pain and suffering and finding award excessive).

On the other hand, the July 1996 CT scan showed increased densities in the throat area and the possibility of retained glass. Dr. Thaler's initial visitation note, dated July 23, 1996, describes the removal of "[a] long piece of glass stuck into the soft palate and left tonsil." (Ex. B). Elsewhere, she describes the foreign body as a "glass shard." (Ex. B). The note further recites the increased density observed on the CT scan which could either be "calcification from chronic infection or silicon from glass." (Ex. B). In addition, although there is no evidence that Dr. Brayman made a follow-up appointment with Dr. Thaler, despite her direction (Ex. B), she describes Dr. Brayman's physical pain and suffering as a "persistent discomfort in the left tonsil area with a feeling of fullness." (Ex. B).

For the six weeks following the incident,[16] Dr. Brayman experienced intermittent pain and swelling in his left peritonsillar region and the left part of his neck. He also intermittently suffered from a fever and took medication and believed he had an infection. The extent of the injuries prompted him to make an appointment to see an ear, nose and throat specialist,. Dr. Thaler, prior to the July 19 hospitalization for DVT. According to Dr. Thaler's initial visit note, in the weeks preceding the July 23 appointment with Dr. Thaler, Dr. Brayman experienced persistent discomfort.[17]

As previously explained, the award consisted of Dr. Brayman's past and future pain and suffering and loss of enjoyment of life due to the injuries to his throat.[18] In this respect the jury, as instructed, could award Dr. Brayman damages for the bodily injuries to his throat and mouth and any resulting pain and suffering, emotional distress, anxiety, mental anguish, embarrassment and loss of enjoyment of life. The jury could consider Dr. Brayman's fear and anxiety caused by the glass shard lodging in his throat, the dislodgment and the sight of his blood on the shard once removed. *See generally Laaperi v. Sears, Roebuck & Company, Inc.,* 787 F.2d at 735 (setting forth similar mental elements for

---

**16.** According to Dr. Brayman, the intermittent pain, swelling and fever continued during "the weeks following June 1" or "for the six weeks following June 1." It had not totally resolved at the time of his hospitalization for DVT.

**17.** Although the note describes Dr. Brayman's discomfort and feeling of fullness as continu-

ing over "the next several months," this court assumes and a reasonable jury could only conclude, in light of the July 23, 1996 date of this initial visit, that this was a typographical error or oversight.

**18.** See footnote number 12.

pain and suffering damages); *Bullard v. Central Vermont Railway, Inc.*, 565 F.2d at 197 (same). The jury could also consider whether the throat injuries caused any continuing fear or anxiety and/or continuing physical discomfort. *See generally Bullard v. Central Vermont Railway, Inc.*, 565 F.2d at 197 n. 3 (noting that "all common law jurisdictions" allow a plaintiff who suffers a physical injury to recover for fright suffered during the incident "and for mental distress directly associated with his physical injuries").

Dr. Brayman's testimony, summarized *supra*, evidences Dr. Brayman's intangible distress and his disturbing experience of removing a blood stained, one inch long piece of glass. Suffering a puncture wound, he immediately sought treatment at the Falmouth Hospital. He experienced irritation and soreness in his throat for the next few days and intermittent pain similar to a sore throat and inflammation in the weeks following the June 1 incident. The CT scan supports Dr. Brayman's testimony regarding the inflammation. Dr. Thaler corroborated Dr. Brayman's testimony to the extent that she noted the removal of a "long" piece of glass, residual swelling and Dr. Brayman's "persistent" discomfort. Dr. Brayman was also concerned enough about his condition to take medication, albeit not on a consistent basis, in the weeks following the June 1 incident.

Although the issue is close, in light of the deference afforded the jury's assessment of these intangible losses under the previously described standard applicable to the motion, this court cannot say that the $25,000 exceeds any rational estimate of Dr. Brayman's loss based on the evidence. While undoubtedly at the upper limit for an award based on the evidence, the $25,000 amount is neither shocking nor an excessive amount of money in light of the evidence. Defendant's counsel presented a strong and cogent argument but, in the end, did not meet the high burden of proof applicable to the motion.

Canvassing similar awards in other jurisdictions does not merit a different conclusion. To begin with, notwithstanding the parties' citations to damages awards in "similar" cases, in this circuit, "the paramount focus in reviewing a damage award" is "the evidence presented at trial." *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 579 (1st Cir.1989); *accord Havinga v. Crowley Towing and Transportation Company*, 24 F.3d at 1488 (citing *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d at 579); *see also Smith v. Kmart Corporation*, 177 F.3d at 32. Although similar awards are not irrelevant, *see, e.g., Bonn v. Puerto Rico International Airlines, Inc.*, 518 F.2d 89, 93 (1st Cir.1975) (comparing awards in comparable Puerto Rico cases), "[t]he value of any comparison will depend upon the similarities of the injuries, the locations and dates of the trials, and of the evidence presented therein." *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d at 579.

Neither the cases cited by plaintiffs or defendant,[19] proved sufficiently similar. Upon close inspection, plaintiffs' cases involve different injuries and/or additional elements of damages, *see Williams v. Roche Brothers Supermarkets, Inc.*, 1999 WL 788509 at *1 (July 20, 1999) ($18,500 verdict for broken tooth, i.e., permanent injury, and case failed to elaborate upon whether the $18,500 award was solely for past and future pain and suffering and loss of enjoyment of life); *Creach v. Sara Lee Corporation*, 331 S.C. 461, 502 S.E.2d 923, 924 (App.1998) (broken tooth, i.e., permanent injury, which caused severe pain requiring extensive dental work and $3,000 lost wages); *Shoney's Inc. v. Pasley*, 711 So.2d 1026, 1027–1029 (Ala.Civ.App.1997) ($75,000 compensatory damages not excessive where damages included economic losses as well as pain and suffering damages and concerned a plaintiff who drank sodium hypochlorite bleach allegedly resulting in injuries to the plaintiff's mouth, throat, esophagus, other internal organs, aggravation of pre-existing condition, loss

---

**19.** See footnote number two.

of earnings as well as anxiety, fear and mental anguish), or more severe injuries. *See Gannon v. S.S. Kresge Company,* 114 Conn. 36, 157 A. 541, 541 (1931) ($2,500 award, including $800 for pain and hysteria, not excessive to the plaintiff, a patron at the defendant's lunch counter, who ate sandwich containing pieces of glass, which entered her mouth and throat, compelling her "to enter a hospital in Bridgeport for treatment" and thereafter a hospital in Philadelphia and causing hysteria and possible resulting miscarriage); *O'Brien v. Louis K. Liggett Company,* 255 Mass. 553, 152 N.E. 57, 57 (1926) (drugstore patron ate and swallowed shortcake containing one large and number of small pieces of glass causing her mouth and tongue to bleed "for two hours" with glass "evacuated five days later" by physician);[20] *Rossommano v. Quality Dairy Co.,* 297 S.W.2d 591, 592–594 (Mo.Ct.App.1957) ($2,000 award in 1957 in Missouri for broken glass in buttermilk wherein the plaintiff drank milk, felt pain in her throat, vomited at the time and for a week thereafter, experienced diarrhea for a week, chest pain for two to three weeks and aggravation of gall bladder condition for two to three months); *Wichita Coca–Cola Bottling Company v. Tyler,* 288 S.W.2d 903, 904–904 (Tex.Ct.App.—Fort Worth 1956) ($3,500 verdict not excessive for the plaintiff who drank Coca–Cola containing dead mouse, vomited repeatedly that day, was hospitalized for three days with intravenous feeding, continued to vomit occasionally for one month, and still experienced weak stomach at time of trial 14 months after incident).

Although not cited by the parties, the 1984 decision of *Robinson v. ITT Continental Baking Company,* 2 Conn.App. 308, 478 A.2d 265 (1984), provides a closer comparison to the case at bar and reinforces the conclusion that the $25,000 award is not excessive. In *Robinson,* a negligence and breach of warranty action, the plaintiff swallowed a cupcake containing slivers of glass resulting in an injury to her throat. *Robinson v. ITT Continental Baking Company,* 478 A.2d at 267. There was no indication of medical treatment for the injuries although there was testimony that the injury affected the plaintiff's voice creating the inference of a permanent injury. Although the defendant contended that the $22,500 award was excessive, the court rejected the argument. *Robinson v. ITT Continental Baking Company,* 478 A.2d at 268–269.

In sum, this court will uphold the $25,000 jury award inasmuch as it is a rational estimate of the damages suffered by Dr. Brayman for the injuries to his throat. Although generous and, indeed, a greater amount than what this court would award, the amount is neither grossly excessive nor shocking.

## II. *PLAINTIFFS' MOTION TO AMEND JUDGMENT TO INCLUDE PREJUDGMENT INTEREST AND COSTS (DOCKET ENTRY # 30)*

Plaintiffs seek an award of prejudgment interest on the $25,000 verdict in the amount of $5,104.10 in accordance with the

---

**20.** Plaintiffs cite to the later opinion of the Massachusetts Supreme Judicial Court ("the SJC"), *O'Brien v. Louis K. Liggett Company,* 282 Mass. 438, 185 N.E. 28 (1933). That opinion, however, contains no description of the plaintiff's injuries. The case originally went to trial in 1925 and the jury returned a verdict in favor of the plaintiff. The defendant appealed the trial court's denial of a motion for a directed verdict and the SJC sustained the defendant's exceptions in *O'Brien v. Louis K. Liggett Company,* 255 Mass. 553, 152 N.E. 57 (1926). That opinion details the above paraphrased facts describing

the plaintiff's injuries. The $2,000 verdict referenced in *O'Brien v. Louis K. Liggett, Company,* 282 Mass. 438, 185 N.E. 28 (1933), however, results from a second jury trial which took place in 1932 after rescript. Accordingly, because there is no description of the plaintiff's injuries in the context of the second jury trial, *O'Brien* is of limited value. At most, this court can only assume that somewhat similar evidence concerning the plaintiff's injuries was presented to the jury in the second trial wherein the jury returned the $2,000 verdict.

statutory interest rate of 12% under section 6B of Massachusetts General Laws chapter 231. (Docket Entry # 30). Defendant does not expressly object to the inclusion of prejudgment interest and to issuance of an amended final judgment to reflect such inclusion.

As previously stated, the jury awarded Dr. Brayman $25,000 in damages. The instructions allowed the jury to award Dr. Brayman damages only for past and future pain and suffering and loss of enjoyment of life. Neither plaintiffs nor defendant requested an elemental breakdown of the damages award. Thus, without objection from either party, the special verdict form did not bifurcate the past from the future damages. Instead, the special verdict form asked the jury to determine a lump sum that would fairly and reasonably compensate Dr. Brayman for the injuries to his throat. The jury answered this single question and awarded Dr. Brayman $25,000.

## DISCUSSION

■ Section 6B of Massachusetts General Laws chapter 231 ("section 6B") directs the clerk of court to add interest at the rate of 12% per annum to damages awards for personal injuries. Mass.Gen.L. ch. 231, § 6B. The statute contains the following mandatory language requiring the addition of prejudgment interest to a jury's award of pecuniary damages for personal injuries:

> In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there *shall* [emphasis added] be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict

or finding beyond the maximum liability imposed by law.

Mass.Gen.L. ch. 231, § 6B.

As noted by the SJC, the primary purpose of section 6B is to compensate the injured party "for the loss of use or the unlawful detention of money." *Conway v. Electro Switch Corporation,* 402 Mass. 385, 523 N.E.2d 255, 258 (1988). Consequently, the statute does not encompass prejudgment interest on damages which are for losses incurred in the future. *See Conway v. Electro Switch Corporation,* 523 N.E.2d at 256 (construing section 6B to preclude damages for front pay in employment discrimination suit inasmuch as SJC saw "no justification for adding interest to damages which, by definition, are for losses to be incurred in the future").

■ It is true that, under the statute, future lost wages are treated as an already incurred loss and therefore subject to an award of prejudgment interest in personal injury cases. *Kuppens v. Davies,* 38 Mass. App.Ct. 498, 649 N.E.2d 164, 165, *review denied,* 420 Mass. 1105, 651 N.E.2d 410 (1995); *see Commonwealth v. Johnson Insulation,* 425 Mass. 650, 682 N.E.2d 1323, 1334 (1997) ("in the case of personal injury, prejudgment interest is to be awarded for the loss of earning capacity, even though it is future income that is affected by that loss"). Damages for future pain and suffering and loss of enjoyment of life, however, compensate for losses to be incurred in the future and therefore fall outside the reach of section 6B.

■ In order to prevent a potential windfall to the plaintiff under the statute, *see generally St. Paul Surplus v. Feingold & Feingold,* 427 Mass. 372, 693 N.E.2d 669, 673 (1998) (reasoning that calculation under section 6B which would provide the plaintiff with windfall should be avoided "as a matter of fairness"), it is incumbent upon the defendant to request an itemization of a compensatory damages award for future emotional distress. *See McCarthy v. The Ground Round,* 1998 WL 726604 at *3–4 (Mass.Super. Oct.15, 1998).[21] Defen-

---

21. As reasoned by the court in *McCarthy,*
> If a defendant wishes to prevent a plaintiff from receiving excessive interest for lost

back pay he can accomplish this by requesting that the jury in its special verdict item-

dant did not request an itemization of the compensatory damages. Accordingly, prejudgment interest shall be awarded on the entire $25,000 amount.

Prejudgment interest is recoverable at a rate of 12% per annum determined "from the date of commencement of the action." Mass.Gen.L. ch. 231, § 6B. Plaintiffs request an award of $5,104.10 in prejudgment interest, calculated from the July 17, 1998 filing of the complaint. (Docket Entry # 30). Twelve percent of $25,000 is $3,000. The first year therefore resulted in a prejudgment interest figure of $3,000. There are 257 days from July 17, 1999 to March 30, 2000.[22] Prejudgment interest accrued in a daily amount of $8.22 resulting in a total amount of $2,112.54 for 257 days. Accordingly, plaintiffs are entitled to recover prejudgment interest in the total amount of $5,112.54.[23]

## CONCLUSION

In accordance with the foregoing discussion, the motion for a remittitur or for a new trial (Docket Entry # 35) is **DENIED.** The motion to amend (Docket Entry # 30) is **ALLOWED** insofar as it seeks an award of prejudgment interest. A final judgment in the amount of $30,112.54 shall enter forthwith.

ize for each year the amount of back pay that is due.
*McCarthy v. The Ground Round,* 1998 WL 726604 at *3–4 (Mass.Super. Oct.15, 1998). The court then applied this same reasoning to the nonitemized past and future damages for emotional distress and awarded prejudgment interest on the entire amount. *See McCarthy v. The Ground Round,* 1998 WL 726604 at *3–4 (Mass.Super. Oct.15, 1998).

22. Plaintiffs contend there are 256 days. February 2000, however, was a leap year.

23. In accordance with the June 20, 2000 Order (Docket Entry # 42), Dr. Brayman may submit a bill of costs to the clerk within 20 days of the date of this opinion.